**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Patrick W. McCANN, III and Jon Joseph Kelly, Defendants-Appellants.**

**No. 71-2848.**

United States Court of Appeals, Fifth Circuit.

June 12, 1972.

Rehearing and Rehearing En Banc Denied July 21, 1972.

Emmett Colvin, Jr., Dallas, Tex., for McCann.

Lawrence B. Mitchell, Charles W. Tessmer, Ronald L. Goranson, Frank S. Wright, Dallas, Tex., for Kelly.

Eldon B. Mahon, U. S. Atty., Andrew Barr, Asst. U. S. Atty., Dallas, Tex., for plaintiff-appellee.

Before RIVES, COLEMAN and DYER, Circuit Judges.

COLEMAN, Circuit Judge:

The appellants, Jon Joseph Kelly and Patrick McCann, III, were both charged in each count of a four count indictment with unlawfully intercepting and endeavoring to intercept wire communications in November and December, 1969, and January, 1970, originating from telephones at four Dallas area residences, all in violation of 18 U.S.C. § 2511(1) (a).

Both appellants pleaded not guilty and were tried before a jury in the United States District Court for the Northern District of Texas. They were found guilty on all four counts of the indictment.

On September 9, 1971, the appellants were sentenced to three years imprisonment on each count of the indictment. All sentences imposed were to run concurrently with one another.

Appellants contend (1) that the trial court erred in denying appellants' motion to suppress and in admitting products of and evidence resulting from illegal searches and seizures in violation of their rights under the Fourth and Fifth Amendments to the Constitution of the United States; (2) that the evidence was insufficient to support the conviction; (3) that the instructions given by the trial court to the jury were erroneous; (4) that the trial court erred when it failed to dismiss the indictment against the appellants since it did not negate all the statutory exceptions listed in 18 U.S.C. § 2511(1) (a); (5) that the government's evidence showed that the offense committed, if any, was not in violation of 18 U.S.C. § 2511(1) (a) as alleged in the indictment; and (6) that

the failure of the trial court to admit defendants' Exhibit 1–A was erroneous.

We find no merit in any of these contentions and the judgments of conviction are affirmed.

Because appellants have challenged the sufficiency of the evidence to sustain the jury verdict and the correctness of the trial court's denial of their motion to suppress, the evidence produced on the motion to suppress and at the trial will be discussed in some detail.

I

Testimony given at the pre-trial hearing on the motion to suppress disclosed that the events which led to the arrest of Kelly and McCann began on Friday, January 9, 1970, when Mrs. Dorothea Jamison, a resident of 2405 Grandview Street in Richardson, Texas, telephoned the Richardson Police Department to complain about a 1970 blue Ford Torino, Texas License No. FLM 584, which had been parked overnight near her home. Mrs. Jamison told the police that neither she nor her neighbors knew to whom the car belonged.

In response to her complaint, Police Investigator Jerrold Sanders determined that the car was owned by a Hertz Rent-A-Car Agency which had its office on Preston Road in Dallas and that it had been rented to Jon Joseph Kelly on January 6, 1970. In the rental agreement Kelly listed his home address as 2744 Briarhurst, Houston, Texas, and his local address as the Holiday Inn Central. Sanders also discovered that when Kelly arrived to rent the Torino he was riding in a Ryder Rent-A-Truck driven by another white male.

Subsequent inquiry at the Holiday Inn Central revealed that Kelly had checked in on January 5, 1970, and had checked out on January 10. On his registration card, he had listed his last address as the Hilton Inn on Central Expressway in Dallas.

Officer Sanders also determined that Kelly had rented a panel truck from Ryder Rent-A-Truck Agency in Dallas on January 5, 1970, where he had given his local address as the Hilton Inn on Central Expressway.

Sanders then called the Hilton Inn on Central Expressway and discovered that no one with the name "Jon Joseph Kelly" had been registered there.

On January 12, 1970, Sanders was told by the Hertz Agency that Kelly returned the Ford Torino and rented a blue 1970 Mercury station wagon, Texas License No. FKW 929. He was also told that Kelly advised the sales clerk that he had moved to the Holiday Inn North.

Investigation at the Holiday Inn North revealed that Kelly had checked in on January 10, 1970, and was still registered there. The motel manager told Sanders that Kelly instructed the desk clerk not to reveal that he was registered there. On his registration, Kelly listed his home address as 2744 Briarhurst, Houston, Texas, and stated that he was self-employed.

On January 13, 1970, a neighborhood resident reported that a blue Mercury station wagon, Texas License No. FKW 929, had been parked in front of 2410 Grandview sometime during the night of January 12, and remained there until approximately 12:30 p. m. when a man riding in a blue 1970 Ford, Texas License No. RSR 822, stepped out of the Ford, got into the station wagon and drove away.

A check on the registration of the Ford revealed that it was owned by a Hertz Rent-A-Car Agency located at Love Field in Dallas. Inquiry at the agency revealed that the car was rented by Jon Joseph Kelly on January 5, 1970, who listed his local address as the Hilton Inn on Central Expressway.

Because of the suspicious nature of these activities, the Houston Police Department was asked for its assistance. On January 14, 1970, the Houston Police told Sanders that no one with the name "Jon Joseph Kelly" had ever lived at 2744 Briarhurst in Houston.

Further contact with the Holiday Inn North revealed that on January 14, Kelly

reserved a room next to his for a friend named Ron Adams. When Adams checked in, he stated that he was employed by "A & B Enterprises, 1503 South Post Oak Street, Houston, Texas". Sanders was also told that another man, neither Kelly nor Adams, had paid their motel bill in cash.

Subsequent inquiry revealed that A & B Enterprises was located at a different address in Houston than that given by Ron Adams.

Random checks at the Holiday Inn North by Sanders also revealed that the Mercury station wagon was parked there periodically.

On January 15, 1970, while driving on Grandview, Sanders spotted the Mercury station wagon. Investigating, he looked through a window of the car and observed that there was nothing in the station wagon except some newspapers which completely covered the car's right front floorboard. Sanders noticed that instead of lying directly on the floorboard, the papers were level with the transmission hump which divides the driver's side of the front seat from the passenger's side of that seat.

After returning to the police station, Sanders received a call from Mrs. Jamison who reported that the Mercury station wagon had remained in front of 2410 Grandview during the night of January 14 until about 12:15 p. m. on the 15th when a red Mustang, Texas License No. LYK 591, came down the block and stopped beside the station wagon. She reported that after the car stopped, a white male with blond hair got out of the car and checked the tires on the station wagon. After he checked the tires, she reported that the man got into the station wagon and both cars were driven away.

A registration check on the red Mustang revealed that it was owned by Budget Rent-A-Car located at 2419 Mockingbird Lane in Dallas. Inquiry at the agency revealed the car had been rented to Patrick W. McCann, III, who listed his home address as 8319 Little Drive, Houston, Texas.

On the afternoon of January 15, Sanders received separate telephone calls from Mrs. Jamison and Mrs. Margot Bunday, a resident of 2406 Grandview. Both ladies reported that a white male had left the red Mustang on Grandview at approximately 4:15 p. m. and had driven away with another white male in the Mercury station wagon.

Information which had been collected concerning the cars was discussed on several occasions by detectives of the Richardson Police Department. They had discussed the possibility of the cars being used as a narcotics drop and the possibility that the cars might be connected with thefts which had occurred in the area where they had been parked.

On the morning of January 16, 1970, the Mustang remained parked at 2405 Grandview. Sanders and Detective Ray Pennington investigated and, looking through a window of the car, both officers observed that the vehicle did not contain anything except newspapers which were arranged in approximately the same way as the newspapers had been arranged in the Mercury station wagon on the preceding day. It seemed that the newspapers were being used to conceal some article from view.

At that time, members of the Richardson Police Department began a continuous surveillance of the Mustang. Detective Pennington parked his car on Grandview some distance from where the Mustang was parked. His car was an unmarked four door sedan with a police antenna and a spotlight.

Shortly after noon, Pennington observed a Mercury station wagon, occupied by two white males, drive along Grandview and slow down as it passed the Mustang. Pennington reported the license number of the station wagon to Sanders who determined that its license number matched that of the station wagon rented by Kelly. The car drove on and passed by again, at which time, the men glanced at Pennington.

Sanders observed the station wagon travelling south on Central Expressway and followed it into Dallas. About 1:30

p. m. the Hertz Agency on Preston Road informed Sanders that Kelly had returned the station wagon.

At approximately 4:00 p. m. on January 16, Investigator George Taylor came on duty and was briefed on the day's developments. He then relieved Pennington and obtained permission of a neighborhood resident to use her carport at the corner of Grandview and Little Creek, approximately one hundred yards south of the Mustang, as a place for surveillance. Taylor parked his car in the carport and began to observe the Mustang.

At approximately 5:10 p. m., a white male, later identified as Jon Joseph Kelly, appeared near the automobile. As Taylor watched, Kelly looked around the neighborhood, pulled up his socks, adjusted his coat and looked around again. He then got into the Mustang and proceeded to drive south down Grandview. At this time, Taylor decided to stop the car and question its driver.

The Mustang drove past Taylor's observation point to the end of the block where Grandview intersects with Fall Creek and proceeded west. Taylor entered Grandview, turned on his red lights as he approached Fall Creek, and ran through the stop sign at Grandview and Fall Creek in order to catch up with the Mustang.

The Mustang drove down Fall Creek to where it intersects with Custer Parkway. As it approached this intersection it slowed to a speed of approximately five miles per hour and turned right without stopping at the stop sign at the intersection.

Taylor stopped the Mustang in the first block north of the intersection of Fall Creek and Custer Parkway, approximately one-half mile from the point where Taylor had maintained his observation post.

Kelly stepped out of the Mustang and walked back to a point between the two cars where Taylor met him. Taylor identified himself and asked Kelly for his driver's license. Kelly produced a valid Texas license bearing the name "Jon Joseph Kelly". However, a home address different from the one he had been using appeared on the license.

Taylor explained to Kelly that he stopped him because of suspicious activities concerning cars rented by him in the area and because he failed to stop at a stop sign. He then asked Kelly several questions. In response, Kelly stated that the Mustang was rented, that a friend brought him to get the car, and that he did not know where or who the friend was.

Taylor looked into the Mustang and observed the newspapers which covered the car's right front floorboard. Taylor asked Kelly if he could look inside. He stated he believed his exact words were, "You don't mind if I look in your car, do you?" Kelly said, "No, sir, I don't".

Taylor opened the door on the left side of the car, reached across the front seat and unlocked the door on the right side. With Kelly, he walked around to the door on the right side of the car, opened the door, looked underneath the newspapers where he found a green briefcase.

Taylor asked Kelly what was in the briefcase. Kelly said he had no idea. Taylor opened the briefcase and found an FM radio, a tape recorder, one tape and other electronic equipment.

Kelly was placed under arrest and taken to the Richardson police station. Found among his possessions was a sales ticket reflecting the purchase of three tapes on January 15, 1970, from one of the Crabtree Electronics stores in the Dallas area.

The F.B.I. was then contacted. As a result, Special Agent William Holloman went to the Richardson police station where he listened to a portion of the tape taken from the Mustang. Holloman was able to identify two of the voices on the tape as those of Mr. and Mrs. Paul Rothermel, Jr., residents of 2406 Little Creek in Richardson.

Later that evening, Holloman's identification was verified by Mrs. Rothermel who told police that the contents of the tape were recent telephone conversations in which she had participated.

After Mrs. Rothermel identified her voice on the tape, Pete Schell, Jr., a Southwestern Bell Telephone Company repair supervisor, arrived and removed a device which had been attached to the Rothermel telephone line from the terminal located behind their house.

Special Agent Holloman presented an affidavit summarizing this information to the United States Commissioner who issued a search warrant authorizing the search of Kelly's room at the Holiday Inn North. The search of this room yielded a large quantity of electronic paraphernalia, various notes and records.

Investigation over the next few days revealed that similar devices had been attached to the telephone lines of John H. Brown, George Cunyus, and John W. Curington.

On May 13, 1971, as the result of subsequent investigation, Patrick W. McCann, III was also arrested and charged with violating 18 U.S.C. § 2511(1) (a).

Prior to the trial, Kelly and McCann filed a motion to suppress all evidence obtained directly or indirectly from the search of the Mustang and from the search of Kelly's room at the Holiday Inn North. They contended that there was no probable cause for the search of the Mustang and that therefore, all evidence obtained as the result of that search, including that obtained from the search of Kelly's room under the search warrant was the "fruit of the Poison Tree". They also contended that the facts stated in the affidavit used to obtain the warrant did not show probable cause but only created a suspicion that the missing tapes were located there.

After a pre-trial hearing on the motion to suppress, the trial court found that probable cause existed for the search of the Mustang and that the search warrant authorizing the search of Kelly's motel room was valid.

At the trial, the Government presented twenty eight witnesses. The first of these was Miss Mary Kay Mooney, who was employed during the months of November and December, 1969, as a secretary for the private investigative firm of Clyde Wilson and Associates in Houston, Texas. Miss Mooney testified that W. J. Everett was manager of the firm and that one of the appellants, Jon Joseph Kelly, was employed as one of its investigators. She also testified that McCann, although not employed by the firm as an investigator, came by the firm's office during November and December of 1969 and participated in conferences with Everett or Kelly.

Miss Mooney testified that one of her duties was to maintain a record of the time spent on a particular matter by an investigator. Beginning in Mid-November and continuing through December 22, 1969, when she terminated her employment with the firm, Miss Mooney testified she maintained a ledger entitled the "Hunt Matter", and that the time spent away from the office by both Kelly and Everett in early December was posted to this ledger.

When Kelly returned to Houston after one of these periods away from the office, Miss Mooney testified she observed him unloading equipment, including small tape recorders, from his car.

After Miss Mooney testified, the Government called eight witnesses who were or who had been employees of various car rental agencies in Dallas.

Their testimony established that:

1. On December 3, 1969, Kelly rented a Ford Econoline truck from Ryder Truck Rental, Dallas, Texas, which was returned the same day.

2. On January 5, 1970, Kelly rented a two door Ford automobile, Texas License No. RSR 822 from Hertz Rent-A-Car, Love Field, Dallas, Texas.

3. On January 6, 1970, Kelly rented a Mustang automobile, Texas License No. LZZ 755 from Econo-Car, Love Field, Dallas, Texas.

4. On January 6, 1970, Kelly rented a Ford Econoline truck from Ryder Truck Rental, Dallas, Texas. This truck was returned the next day.

5. On January 6, 1970, Kelly rented a Ford Torino from a Hertz Rent-A-Car Agency, Preston Road and Northwest Highway, Dallas, Texas. This car was

returned by Kelly on January 13, 1970, at which time he rented a Mercury station wagon, Texas License No. FKW 929. This car was returned by Kelly on January 16, 1970.

6. On January 6, 1970, Patrick McCann rented a Mustang, Texas License No. LYK 591, from Budget Rent-A-Car, Love Field, Dallas, Texas. This was the car in which Kelly was stopped by Detective Taylor on January 16, 1970.

7. On January 7, 1970, McCann rented what was believed to be a Chrysler automobile from Earl Hayes Car Rental Company, Dallas, Texas. This car was returned on January 16, 1970.

As its next witnesses the Government called Mrs. Margot M. Bunday and Mrs. Laura L. Vaden, two neighbors of the Paul Rothermels, who were the victims of the offense alleged in Count 1 of the indictment. Mrs. Bunday and Mrs. Vaden lived at 2406 Grandview and 2407 Grandview respectively. Their houses faced the street which ran one-half block behind the Rothermel home.

Mrs. Bunday testified that on January 9, 1970, she observed a blue automobile parked in the street in front of her home occupied by a man who sat there for a long time and who bent down at times "doing something". She testified that later that afternoon the man departed, leaving the automobile to remain there until Tuesday morning, January 13, 1970.

On Wednesday, January 14, 1970, Mrs. Bunday observed a Ford, Texas License No. RSR 822, (the car rented by Kelly from Hertz Rent-A-Car on January 5, 1970), parked near her home and occupied by a tall young man with blond hair. (It was established that Kelly is a tall young man with blond hair.) As she continued to observe the car, Mrs. Bunday testified she saw the man sitting in the car wave to the driver of a red car, which then stopped. Mrs. Bunday saw the man sitting in the Ford get out and step into the red car, which then drove away.

Mrs. Bunday testified that on Thursday morning, January 15, 1970, a Mercury station wagon was parked where the Ford had been left on Wednesday evening. About noon that day, she observed a red Mustang, Texas License No. LYK 591, drive down the street and stop beside the station wagon. (A Mustang with the same license number was rented by McCann on January 6, 1970). She saw the same young man she had observed sitting in the Ford on Wednesday, get out of the Mustang and check the rear tires of the station wagon. Both cars were then driven away.

Mrs. Bunday testified that on Friday, January 16, 1970, the red Mustang was parked where the station wagon had been parked on Thursday. About noon at which time members of the Richardson Police Department were maintaining a continuous surveillance of the Mustang, she observed two men drive by in the station wagon, slow down as they passed the Mustang, and then drive on. Mrs. Bunday testified that it appeared to her the two men had spotted the police surveillance. She testified that the Mustang remained there until late afternoon, when it was driven away in haste.

Mrs. Vaden's testimony corroborated that given by Mrs. Bunday. In addition, Mrs. Vaden positively identified Kelly as one of the men who were involved in moving the cars. Her testimony also indicated that the Mustang was parked overnight on January 15, 1970.

Mrs. Charlotte Levin of 491 Sugar Mill Road, Dallas, Texas, was then called as a witness. Mrs. Levin's house faced the rear of the John H. Brown home at 4609 Gulfstream. The Browns were the victims of the offense alleged in Count 3 of the indictment. Mrs. Levin testified that during the early part of January, 1970, she observed two strange cars parked in the neighborhood for extended periods of time. One was a red Mustang and the other, a Chrysler. Mrs. Levin stated that her attention was particularly attracted to the cars because they were parked on the street in between houses instead of in front of them, as is usual when someone makes a visit to a particular home.

Detective Jerrold P. Sanders of the Richardson Police Department then testified that on January 15, 1970, in response to complaints from neighborhood residents, he inspected a Mercury station wagon parked at 2410 Grandview. He recorded the Texas License number of the car as being FKW 929, and noted that the front floorboard on the passenger side of the car was completely covered with newspapers which were spread from the transmission hump to the right front door. Later that day, he observed the station wagon parked at the Holiday Inn North on Central Expressway in Dallas. (A station wagon with the same license number was rented by Kelly on January 13, 1970.)

Sanders testified that the next morning, January 16, 1970, he inspected a red Mustang, Texas License No. LYK 591, parked at 2410 Grandview. He testified that newspapers were also spread across the car's right front floorboard, approximately three or four inches from the floorboard.

Detective George Taylor of the Richardson Police Department testified that he took over the surveillance of the red Mustang at approximately 4:15 p. m. on Friday, and parked his unmarked police car in the carport of a nearby residence from where he could observe the vehicle. About 5:00 p. m. Taylor observed a man standing near the Mustang. After a brief time, the man got into the Mustang and drove away. Taylor pursued the Mustang for a few blocks and then stopped it. After a brief conversation, Taylor opened the right front door of the Mustang removed the newspapers and discovered a briefcase with a wire and radio cable running into it from under the dashboard. Taylor opened the brief case and discovered a small tape recorder with a tape in place, a voice controlled microphone, and an FM radio with a speaker attached to it. Taylor arrested the man, later determined to be Jon Joseph Kelly.

Taylor testified that on that evening, he, along with Special Agent William Holloman of the F.B.I., and another police officer, went to the Rothermel home where they met Pete Schell, an employee of Southwestern Bell Telephone Company, who removed a small device from the telephone terminal in the alley behind the Rothermel home. The device had been attached to the Rothermel telephone line.

Schell was called as a witness and testified that on January 17, 1970, he discovered similar devices attached to the telephone lines of John W. Curington, the victim of the offense alleged in Count 2 of the indictment, and John H. Brown.

Leroy D'Spain, another employee of Southwestern Bell, testified that he found a similar device attached to the telephone lines of George M. Cunyus, the victim of the offense alleged in Count 4 of the indictment.

The men whose telephone lines were allegedly tapped were called as witnesses. John H. Brown identified himself as a self-employed food broker and manufacturer's representative, who had been, until November, 1969, employed as a sales manager for HLH Products, a subsidiary of Hunt Oil Company. He identified the number of the telephone line upon which the device was found as his and stated he did not know Kelly or McCann. He also stated he had never consented to anyone tapping his telephone line.

Paul M. Rothermel, Jr., who, prior to November, 1969, had been employed as a special assistant to H. L. Hunt, the president of Hunt Oil Company, testified that he did not know the appellants and had not consented to his telephone line being tapped. He also identified one segment of the conversation recorded on the tape found in the Mustang as being a conversation between his wife and a friend about a mutual friend who was obtaining a divorce and another segment as a conversation between him and his wife.

John W. Curington and George Cunyus then testified. Curington had been employed by Hunt Oil Company until November, 1969. Cunyus was employed by Hunt Oil Company as a Vice President

and Director both at the time of the offense alleged in Count 4 of the indictment and at the time of the trial. Both men identified their telephone lines by numbers which corresponded to the number of the lines identified by the telephone linemen as being tapped. Both Curington and Cunyus testified they did not know either Kelly or McCann and had not consented to anyone tapping their telephone lines.

Agent William Holloman of the F.B.I. then testified. Holloman had obtained and executed a search warrant for the search of Kelly's motel room at the Holiday Inn North in Dallas. After Holloman identified it, a spiral notebook found in Kelly's motel room was introduced into evidence. Pages of this notebook reflected expenses incurred over a period from January 4, 1970, until January 16, 1970.

The first entry in the notebook read "Sunday 1–4 Dinner—16.00 P. McCann". Entries for succeeding days reflected expenses for "Meals", "Work Clothes", "Equipment", "Car Rental", "Truck Rental", and "Hotel". Many of the sums written adjacent to these entries corresponded to expenses incurred by Kelly and McCann as reflected by sales receipts and invoices which were introduced into evidence.

Another sheet of notes found in the motel room reflected expenses under various headings such as "Hotel and Tele", "Meals", and "Auto Mileage". Under these headings, various sums were entered and adjacent to these sums the initials "J. K." or "P. M." so as to apparently indicate who incurred the expense.

Another exhibit reflected expenses for "Torino", "Galaxie", "Mustang" and "Chrysler". Copies of car and truck rental agreements signed by either Kelly or McCann were also introduced into evidence.

A handwritten note found in Kelly's motel room which read

"1–6–69—

"Brown talking to Sam—

"Is to meet with Sam tomorrow A.M. (Wed 1–7) and they will call John—to talk about getting their $55,000 out of the deal—"

was also introduced into evidence.

The Government also introduced a number of Crabtree Electronics sales tickets reflecting the purchase of various electronic equipment and supplies. One of these sales tickets was seized from Kelly's person after he was arrested, while the others were taken from his motel room.

Various electronic apparatus taken from Kelly's motel room was also introduced into evidence. Included among this apparatus was a green camouflaged briefcase containing an FM radio; a voice actuated microphone; a tape recorder; batteries and miscellaneous components; fourteen cassette tapes; six reel-to-reel recording tape boxes, five of which contained tapes; four Craig tape recorder microphones; two Craig voice actuated microphones; one bulk magnetic tape eraser; three Craig cassette tape recorders; and three Telefunken reel-to-reel tape recorders.

The recording tape boxes and the plastic cassette tape cases listed above bore handwritten initials, dates and other information. For example, the exhibits listed below bore the notations indicated:

| | | |
|---|---|---|
| Government's | Exhibit | 17-A; "clean"; "B 1/14 10 pm Rev." |
| " | " | 17-C; "clean—R 1/10 2:50 pm" |
| " | " | 17-D; "B 1/15 11:00 pm" "clean" |
| " | " | 17—E; "JC 1/14 10:00" |
| " | " | 16-C; "JB 1/9 5:30 p" |
| " | " | 16-E; "Curington 1/8 7:30 pm" |
| " | " | 16-I; "JC-1-14 10:15 pm" |

Following the testimony of Agent Holloman and the introduction of the

notes, records, and electronic paraphernalia taken from Kelly's motel room, three salesmen from Crabtree Electronics testified and explained Crabtree's was a retail store which sold all types of electronic supplies and equipment. All of them identified Kelly and McCann and testified that they frequently shopped together at the store during December 1969 and January, 1970.

Each salesman identified one or more of the Crabtree sales slips as being in his handwriting and testified that they reflected purchases by one of the appellants, either Kelly or McCann. They also identified large quantities of the electronic apparatus taken from Kelly's motel room as being identical with items sold by them to either Kelly or McCann.

The Government then called two women who had dated the appellants during the period in which they were allegedly tapping the telephones of the victims. Rita Work testified that she had known Kelly for several years and that when he came to Dallas in November, 1969, they had dated frequently. She testified that Kelly was in Dallas for two or three weeks in November and December, 1969, and that he returned in January, 1970. She testified that during the last part of November, 1969, a few days after Kelly called her after arriving in Dallas, she arranged a date between her friend, Penelope Hopper, and Kelly's friend, Patrick McCann.

Rita Work testified that several times in early December, 1969, she and Kelly rode around in the evenings in a car equipped with a second radio which was under the glove compartment and a tape recorder which was near her feet. She testified that on one of these occasions they parked in a residential area off Abrams and Northwest Highway near the Medallion Shopping Center in Dallas, and on this occasion Kelly recorded the voice of a lady making arrangements for a church function. Mrs. Work testified this conversation was broadcast over the second radio. The testimony of George Cunyus, the victim of the offense alleged in Count 4 of the indictment, established the fact that his home was located near the spot where this broadcast was recorded.

Mrs. Work testified that on other occasions, she parked with Kelly in other residential neighborhoods for periods of twenty or thirty minutes. In response to her inquiries, Kelly pointed out particular houses in these areas as the ones in which he was interested in connection with his work as a private investigator.

Penelope Hopper testified McCann told her he owned a custom electronics business in Houston. She testified that several times when she and McCann were with Rita Work and Kelly, she observed Kelly and McCann having very private conversations. She also testified that on one occasion, she observed a briefcase containing a tape recorder in McCann's motel room and that he once telephoned and told her he would be late for a date because he had to listen to a tape.

Special Agent Joseph Parsons, an F.B.I. electronics expert and the last Government witness, identified the devices removed from the telephone lines of Rothermel, Brown, Curington, and Cunyus as FM radio transmitters. He identified one of the wires coming from each device as an antenna, and the other two wires as leads to the source of the audio. Parsons testified that he had tested the transmitters and all of them were functional. He testified that with a fully charged battery, each transmitter had a broadcast range of approximately 1,050 feet in a residential neighborhood. Parsons testified that the devices, if equipped with a new battery, would operate for fifteen days before voltage drain made the device inoperable.

II

To justify the search of the Mustang, the Government contends that Kelly consented to the search, or, in the alternative, that Detective Taylor had probable cause to search the car.

It has been recognized that a stop and ensuing limited detention of individuals must be permitted under certain circumstances if law enforcement

officers are to carry out their functions of crime prevention and detection. The circumstances which must exist before an individual can be stopped must enable a police officer to reasonably suspect that the particular individual is involved in criminal activity. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Dodd v. Beto, 5 Cir., 1970, 435 F.2d 868.

At the time he stopped the Mustang, Taylor knew, *inter alia,* that certain cars, of which the Mustang was one, had been parked in the same residential neighborhood for a period of eight days; that a different car had appeared almost daily in the neighborhood; and that no one car had been allowed to remain in the neighborhood for an extended period. He also knew that the men who had rented these cars had no acquaintances in or connection with the neighborhood; that one of them, Jon Joseph Kelly, had given false information to motels and car rental agencies concerning his home address and a prior motel address; and that Kelly had also asked the Holiday Inn North not to disclose the fact that he was registered there.

Taylor knew that police officers had seen newspapers arranged to cover the right front floorboard in two of the cars, a Mercury station wagon and the Mustang, and that the newspapers in both cars were three or four inches above the floorboard so as to apparently conceal some article. He also knew several burglaries had occurred in the area and that on past occasions under similar conditions, vehicles had been used as "narcotic drops".

Therefore, based on the information which he had when the Mustang pulled away from the spot where it had been parked on Grandview, we think Detective Taylor had reasonable grounds to stop the car and make a general investigative inquiry of its driver. See United States v. West, 5 Cir., 1972, 460 F.2d 374 (1972).

After the car was stopped, certain events occurred which justify the search on two grounds: (1) consent to the search by Kelly, and (2) probable cause to search.

After stopping the car, Detective Taylor was met between the Mustang and his police car by Kelly. After looking into the car through its back window, Detective Taylor asked Kelly if he would mind if he looked in his car. Kelly replied, "No, sir, I don't". In searching the car, Taylor discovered the electronic gear and the tape in the briefcase which was concealed beneath the newspapers.

Appellants argue that such an answer by Kelly to Taylor's request was equivocal in that it could be construed to mean permission to only look inside the automobile from where Taylor was standing. However, Taylor's request, made after he had looked into the car through its back window, could only be a request to search. The circumstances under which a statement is made must be considered in determining that statement's equivocality.

In addition, although nothing in the record indicates that Kelly's consent was coerced or involuntary, appellants also contend that a waiver of the constitutional right to refuse consent to a search cannot be established unless it is shown that the consent to the search was given with the knowledge that it could be withheld. They contend that this means that the officer must state affirmatively that he will not search if permission is refused, or that he cannot and will not search without consent. They argue that this Court has said as much by its decision in Perkins v. Henderson, 5 Cir., 1969, 418 F.2d 441. However, such a reading of *Perkins* was recently rejected by a decision of this Court. See United States v. Resnick, 5 Cir., 1972, 455 F.2d 1127, 1133; see, also, Cockerham v. Wainwright, 5 Cir., 1971, 444 F.2d 438.

In conclusion, we hold that Kelly consented to the search of the Mustang, and that under such circumstances as existed and with such information as he had, Detective Taylor would have been

derelict in his duty had he not opened the briefcase.

In addition to having obtained consent to the search of the car, we think Detective Taylor had probable cause to search the car and that as a result, the finding of the District Court that he did was not clearly erroneous. Assuming *arguendo* that Taylor did not have probable cause to search the car at the time he stopped it, we think Kelly's conduct and his answers to the questions which Taylor asked, when combined with the information he had at the time of the stop, gave him probable cause to search the car.

> "The right to search and the validity of the seizure are not dependent on the right to arrest. They are dependent on the reasonable cause the seizing officer has for the belief that the contents of the automobile offend against the law." Carroll v. United States, 267 U.S. 132, 158–159, 45 S.Ct. 280, 287, 69 L.Ed. 543 (1925), as quoted in Chambers v. Maroney, 399 U.S. 42, 49, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

The fact that Taylor did not have knowledge of the commission of a specific crime with which he could connect the vehicle does not answer the question as to whether he had reasonable cause to believe "that the contents of the automobile offend against the law."

When an officer on stopping an automobile under circumstances similar to those under which illegal activity has been conducted, including those activities involving the use of a vehicle as a "drop" for narcotics, is told by the driver of a car that he was dropped off to pick up the car by a *friend* whose name or whereabouts he does not remember or know, he has, we think, reason to believe that the driver is attempting to protect himself or others from being apprehended.

From such a patently clumsy and incredible attempt at such evasion, the officer could reasonably believe that the driver and his associate or associates, whom he was apparently trying to protect, were involved in illegal activity. It follows that such a reasonable belief, when combined with the knowledge that on two separate occasions cars with which Jon Joseph Kelly, the apparent driver of the car, was connected had been observed containing newspapers arranged to conceal something on the right front floorboard of each car, furnishes probable cause to believe that stolen or contraband goods are concealed in the car. Moreover, the probability that such goods were concealed beneath the newspapers is enhanced by Kelly's response of "I don't remember" to Taylor's question as to what was beneath the newspapers.

Appellants cite us to no authority which holds that bizarre answers produced by a reasonable investigative inquiry (permitted by *Terry*) may not provide, together with other information, probable cause to search for stolen or contraband goods.

We emphasize that the lawfulness of the search is not dependent upon Taylor's having probable cause to believe that the car contained a tape recording device with a tape on which telephone conversations had been illegally recorded. It was enough that he had probable cause to believe that the Mustang was carrying stolen goods or contraband.

After having carefully reviewed the testimony that was presented on the motion to suppress the evidence that was obtained as the result of the warrantless search of the Mustang, we hold that the search of the automobile did not violate appellants' rights under the Fourth and Fifth Amendments to the Constitution of the United States.

Appellants contend that the allegations of the seven paragraphs of the affidavit failed to give the magistrate probable cause to believe that recording tapes and other associated paraphernalia were in Kelly's motel room.

Affidavits used to obtain search warrants are to be interpreted in a common sense and realistic manner with probable

cause for the issuance of a warrant when the facts and circumstances shown in the affidavit would warrant a man of reasonable caution in believing that the items to be seized were in the place named in the warrant. United States v. Ventresca, 380 U.S. 102, 108–109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); United States v. Lucarz, 9 Cir., 1970, 430 F.2d 1051, 1055.

In this case, the affidavit set forth the purchase of items by Kelly which could be used in the unlawful interception of wire communications. The fact that the apparent interceptions of wire communications were being made in the Dallas area pointed to the probability that Kelly would keep the tapes in the Dallas area. The tapes had not been found either on his person or in the car. Therefore, common sense dictated that in all probability the tapes would be found at the place where Kelly was staying in Dallas.

After considering the facts and circumstances set forth by the affidavit and after giving due weight to the preference accorded to the magistrate's finding in doubtful or marginal cases, we think that the warrant was validly issued. See United States v. Ventresca, *supra.*

III

Appellants contend that the evidence was insufficient to support their conviction. The evidence showing that the appellants either endeavored to intercept or intercepted communications originating from telephones belonging to Paul Rothermel, John Brown, John Curington, and George Cunyus was largely circumstantial, especially so as to McCann. Therefore, we must determine if the jury could reasonably exclude every hypothesis but that of guilt, viewing the evidence and the reasonable inferences therefrom in the light most favorable to the government. See United States v. Glasser, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1932); Sykes v. United States, 5 Cir., 1966, 373 F.2d 607; Smith v. United States, 5 Cir., 1969, 413 F.2d 1121.

McCann's involvement in the scheme could reasonably be inferred from the following facts: (1) The tape on which the Rothermel's conversations were recorded was found in a car rented by McCann; (2) Rita Work and Penelope Hopper testified that McCann and Kelly were together frequently while in Dallas during late November and December of 1969; (3) Mrs. Hopper also testified that she observed a brief case containing a tape recorder in McCann's room and that on another occasion McCann called and told her he would be late for a date because he had to listen to a tape; (4) McCann had come by the office of Clyde Wilson and Associates several times to talk with Everett and Kelly who were working on the "Hunt matter"; (5) It could reasonably be inferred from the evidence that the "Hunt matter" was located in Dallas; (6) It could reasonably be inferred from the evidence that McCann was in Dallas during January, 1970; (7) McCann and Kelly were together when they purchased electronic apparatus from Crabtree Electronics; (8) Large quantities of electronic apparatus found in Kelly's room were identified as being identical with items purchased by McCann at Crabtree Electronics; (9) A notebook found in Kelly's room was introduced into evidence containing an entry which read as follows, "Sunday 1–4 Dinner—16.00 P. McCann —", and (10) Copies of rental agreements for the rental of the Mustang and another car believed to be a Chrysler signed by McCann were also found in Kelly's room.

That Kelly and McCann endeavored to or did intercept wire communications over telephones owned by the alleged victims can be inferred from the following facts: (1) The tape that was found in the Mustang; (2) Similar devices used to tap telephones were found on the telephone lines of each of the alleged victims; (3) Each of the alleged victims had been or were employed with Hunt Oil Company; (4) Kelly was working on

the "Hunt matter"; (5) Initials matching those of Rothermel, Curington, and Brown were found on the recording tape boxes and cassette tape cases; (6) Curington's name was also found on one of the cassette tape cases; (7) Numbers which could have indicated dates and hours when the tapes had been in place on the equipment monitoring the telephones of the alleged victims were found on these boxes; (8) Rita Work testified that she heard a conversation when parked with Kelly off Abrams and Northwest Highway near the Medallion Shopping Center. The manner in which George Cunyus described the location of his home indicated that it was in the immediate vicinity of the spot where the conversation was heard over a second radio in Kelly's car; and (9) A note was found in Kelly's motel room which read:

"1-6-69

"Brown talking to Sam

"Is to meet with Sam tomorrow A.M. (Wed. 1-7) and they will call John—to talk about getting their $55,000 out of the deal.—"

After viewing the evidence and the reasonable inferences therefrom in the light most favorable, as we must, we conclude that the jury could have reasonably excluded every hypothesis but that of guilt.

IV

Appellants contend that the instructions given by the trial court to the jury were erroneous in three respects: (A) the trial court's instructions on the law of conspiracy were erroneous; (B) the trial court's failure to submit the issue of consent to the jury was erroneous; and (C) the trial court's failure to limit the charge to endeavoring to intercept in Counts 2, 3, and 4 of the indictment was erroneous.

Appellants contend that the court should have clearly limited the charge on the law of conspiracy to the sole issue of whether or not certain statements and acts of each appellant were admissible against the other appellant. They contend that the failure of the trial court to clearly limit the charge on conspiracy to the evidentiary issue may have allowed the jury to convict on the conspiracy issue only, and, at best, was so confusing and misleading as to create sufficient harm to require a reversal.

In considering such a possibility, it should be pointed out that no reference to the *criminal offense* of conspiracy was ever made in the presence of the jury by the trial court or by anyone connected with the trial. The court made it very clear that it was only discussing conspiracy in pointing out when certain conversations made between someone and one of the appellants outside of the other appellant could be considered as evidence by the jury. The court also thoroughly explained and carefully pointed to the offenses with which the appellants had been charged. A cautionary statement that the appellants were not charged with the criminal offense of conspiracy would have been, at best, repetitious.

In response to appellants' contention it is appropriate to repeat the admonition made by Mr. Justice Cardozo in Snyder v. Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674, "There is danger that the criminal law will be brought into contempt * * * if gossamer possibilities of prejudice to a defendant are to nullify a sentence pronounced by a court of competent jurisdiction * * *". 291 U.S. at 122, 54 S.Ct. at 338.

The appellants contend that the trial court committed reversible error in failing to instruct the jury that if they found from the evidence or had a reasonable doubt that any party to the conversations which were intercepted had consented to their interception there must be an acquittal as to the offense alleged in that count.

A defendant in a criminal case is entitled to have the trial court present instructions to the jury which relate to a theory of defense for which there is some foundation in the evidence. See

Strauss v. United States, 5 Cir., 1967, 376 F.2d 416; Perez v. United States, 5 Cir., 1961, 297 F.2d 12.

Therefore, because there was absolutely no foundation in the evidence supporting a defense based on consent and, because, as will be discussed later, it was not necessary that the Government prove that no party to the conversations which were intercepted consented to their interception, we hold that the court was correct in refusing to grant the proposed instruction relating to consent.

Appellants also contend that the trial court erred when it failed to limit the charge in Counts 2, 3, and 4 of the indictment to endeavoring to intercept wire communications.

In so many words, appellants claim that the indictment is duplicitous in that it charges the defendant in one count, in the conjunctive of endeavoring to intercept and intercepting wire communications in violation of 18 U.S.C. § 2511(1) (a). Their contention was overruled by the trial court when presented in the motion for judgment of acquittal made by the appellants.

Where a statute specifies several alternative ways in which an offense may be committed, the indictment may allege the several ways in the conjunctive, and this fact neither renders the indictment bad for duplicity nor precludes a conviction if only one of the several allegations linked in the conjunctive in the indictment is proven. Fields v. United States, 5 Cir., 1969, 408 F.2d 885; Cunningham v. United States, 5 Cir., 1966, 356 F.2d 454, cert. denied 384 U.S. 952, 86 S.Ct. 1573, 16 L.Ed.2d 548 (1966).

As stated before, viewing the evidence and the inferences therefrom in the light most favorable to the government, it is sufficient to support a verdict of guilty on at least one, if not both, of the acts alleged in each count of the indictment.

## V

Appellants contend that the court committed reversible error by not dismissing the indictment against the appellants because it did not negate all the statutory exceptions listed in 18 U.S.C. § 2511.

It was not necessary to recite in the indictment that the interceptions were made without consent. If the appellants believed that they came within the consent exception it was incumbent upon them to prove this fact. As was said in McKelvey v. United States, 260 U.S. 353, 357, 43 S.Ct. 132, 134, 67 L.Ed. 301 (1922), "an indictment * * founded on a general provision defining the elements of an offense, * * *, need not negative the matter of an exception made by a proviso or other distinct clause, whether in the same section or elsewhere and * * * it is incumbent upon one who relies on such an exception to set it up and establish it." See also United States v. Ramzy, 5 Cir., 1971, 446 F.2d 1184; Tritt v. United States, 10 Cir., 1970, 421 F.2d 928.

## VI

Appellants contend that the evidence presented by the government at the trial failed to prove a violation of 18 U.S.C. § 2511(1) (a). As a result, they contend that there was a fatal variance between the offenses alleged in each count of the indictment and the proof adduced at the trial.

As has been stated above, we think the proof was sufficient to show a violation of 18 U.S.C. § 2511(1) (a). Moreover, under the circumstances, it was entirely appropriate to charge the appellants with the violation of that statute.

Assuming that the appellants could have been appropriately charged with the violation of either 18 U.S.C. § 2511(1) (a) or 18 U.S.C. § 2511(1) (b), the decision as to which statute the appellants would be charged with violating is a matter wholly within the discretion of the prosecution. See United States v. Hancock, 5 Cir., 1971, 441 F.2d 1285.

VII

At the trial, the appellants offered for introduction into evidence, the complaints from two lawsuits. The purpose for admitting them was to allegedly show bias and interest on the part of three witnesses, Paul Rothermel, John Curington, and John Brown.

The first of these complaints was filed by Rothermel's wife against Kelly, McCann, W. Herbert Hunt, Ronald Adams, Carl Watson, W. J. Everett, H. L. Hunt, and Hunt Oil Company. In her complaint, Mrs. Rothermel prayed for damages in the amount of $1,600,000 which she claimed was caused by the wiretapping activity which is the basis for the criminal action against McCann and Kelly. This complaint (defendant's Exhibit 1) was admitted into evidence.

The second of these complaints was filed by Hunt Oil Company against John Curington, John Brown, and others. It alleged that Curington and Brown had breached their trust obligations as employees of Hunt Oil Company and had personally profited from various transactions at the expense of Hunt Oil Company.

This lawsuit had absolutely nothing to do with the alleged wiretapping activity and made no reference to either defendant. It had also been settled and dismissed prior to the commencement of the trial of this case. Considering all these factors, we think its relation to the criminal prosecution as showing bias and interest on the part of Brown and Curington was, at the most minimal.

A trial court has considerable discretion as to how and when bias may be proved and as to what collateral evidence is material for that purpose. Mutter v. United States, 9 Cir., 1969, 412 F.2d 178, cert. denied, 397 U.S. 927, 90 S.Ct. 935, 25 L.Ed.2d 107 (1970); United States v. Higgins, 7 Cir., 1966, 362 F.2d 462, cert. denied, 385 U.S. 945, 87 S.Ct. 316, 17 L.Ed.2d 224 (1966).

Under the circumstances, we hold that the trial judge did not abuse this discretion in refusing to admit defendants' Exhibit 1A, a copy of the complaint filed by Hunt Oil Company into evidence.

Having found no error the judgment of the District Court is

Affirmed.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.