**UNITED STATES of America,**

v.

**George KING and Frank Elsis, Defendants.**

**No. 82 Cr. 699 (RWS).**

United States District Court, S.D. New York.

Dec. 15, 1982.

**26**

John S. Martin, Jr., U.S. Atty., S.D.N.Y., New York City, by Paul Shechtman, Asst. U.S. Atty. New York City, of counsel.

Rochman, Platzer & Fallick, New York City, for defendant King; Barry M. Fallick, of counsel.

Donald M. Zolin, New York City, for defendant Elsis.

## OPINION

SWEET, District Judge.

Defendants Frank Elsis ("Elsis") and George King ("King") were arrested October 6, 1982 and subsequently charged in a one count indictment which alleged a conspiracy to use and manufacture counterfeit credit cards in violation of 15 U.S.C. § 1644(a). Elsis has moved for a bill of particulars and to suppress certain physical evidence as well as a statement allegedly obtained from Elsis in violation of his constitutional rights. King has challenged the validity of certain search warrants and has moved to suppress evidence obtained from searches executed pursuant to those warrants. For the reasons set forth below, the motions are denied.

On December 9, 1982 an evidentiary hearing was held in connection with Elsis' mo-

tion to suppress. Lieutenant Dennis Zloty ("Zloty"), a Secaucus, New Jersey police officer, testified that on the morning of October 6, 1982 he arrested Elsis, King and King's wife in Bergen County and impounded Elsis' station wagon which contained assorted boxes of merchandise and small machinery. During the car ride to the Secaucus police headquarters, just moments after the arrest, Zloty advised Elsis of his *Miranda* rights, reading from a card which he carries in his wallet. Zloty testified that Elsis said he understood his rights.

Detective Frank Donnelly ("Donnelly"), a New York City Police Department detective also testified at the hearing. He stated that he and Inspector Richard Bowdren ("Bowdren"), Postal Inspector for the United States Postal Service, met with Elsis at the Secaucus police station at about 10:30 a.m. Donnelly testified that at the outset of the meeting, Bowdren asked Donnelly for his *Miranda* card from which Bowdren read Elsis his rights. Donnelly further testified that after reading each individual right, Bowdren would ask Elsis if he understood the question and that Elsis said he did. After that, Bowdren interviewed Elsis.

Donnelly was not involved in the credit card ring investigation but was investigating a homicide and questioned Elsis after Bowdren was finished. Donnelly testified that Elsis said he knew nothing about the murder, and having heard what Elsis had to say, Donnelly called him "stupid" several times. The entire interrogation lasted for no more than ten to fifteen minutes, during which time Elsis sat without handcuffs, and according to Donnelly, appeared lucid and normal.

At about 2:30 p.m., Elsis was transported to the MCC in Manhattan accompanied by Donnelly and Bowdren. Donnelly testified that during the car ride, Bowdren and Elsis were engaged in small talk about a previous encounter they had had. At no time during the ride did Elsis state that he wanted to remain silent or retain counsel. Every so often, Donnelly told Elsis that he was "stupid." Donnelly testified that at one point,

Elsis, pointing to Donnelly, said to Bowdren:

> Tell him that I am not a bad guy, I am not into violence. I am not a violent person. You know me, I am into plastic and credit cards, but I am not into any violence. I never hurt anybody in my life.

It is this statement that Elsis seeks to suppress.

■ The procedural safeguards outlined in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), are required where a suspect in custody is subjected to interrogation. *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Elsis argues that he was being interrogated in the car on the way to the MCC in Manhattan and that because his rights were not read to him upon entering the car or during the trip, any incriminatory statements made by him during the ride must be suppressed. I conclude, however, that Elsis was not being interrogated.

There is no evidence that Elsis was being questioned in the car by Bowdren or Donnelly about the counterfeit credit card ring. Donnelly did not continue to ask Elsis about the homicide that was under investigation. He did, however, continue to call Elsis "stupid" as he had at the time of questioning at the station house. This name-calling is not "interrogation" within the meaning of *Innis, supra,* 446 U.S. at 302, 100 S.Ct. at 1690 ("the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminatory response.")

Even if Donnelly's remarks concerning Elsis' mental process were reasonably anticipated to elicit a response which might be incriminating, the statement would not be suppressed. Several hours prior to the car ride, Elsis was read his *Miranda* rights on two separate occasions. Both times he said he understood those rights and then voluntarily waived them. At no time during the car ride did he express the desire to exercise his rights. It would exalt form over substance to require under these circumstances

that Elsis receive a third reading of his rights within hours of two prior warnings. What matters is that he understood that he had constitutional rights and was free to exercise them. There has been no indication that he did not.

As to the evidence seized from Elsis' station wagon, it is undisputed that the search was based on a valid warrant. Finally, the Government indicated at the hearing that it would supply particulars requested by Elsis.

■ King has challenged the validity of certain search warrants and has moved to suppress evidence seized pursuant thereto. Prior to the commencement of this action, the Government obtained a search warrant directed at a warehouse rented by King in Secaucus, New Jersey ("Space Station"), and warrants authorizing searches at his residence and of a truck rented by him based in part on the evidence seized at the Space Station. The warrant for the Space Station was issued by a United States Magistrate in the District of New Jersey on October 5, 1982 upon the affidavit of United Postal Inspector James Buchanon ("Buchanon") (which included, as an appendix, the complaint in *United States v. Donald Sanders,* S82 Cr. 627). The Space Station warrant authorized a search for "equipment and other paraphernalia related to the production of counterfeit credit cards." King contends that the affidavit did not state facts sufficient to support a finding of probable cause for the Space Station search and that the subsequent searches of his home and rented truck should be suppressed as fruits of an illegal search. I reach the opposite conclusion.

From the *Sanders* complaint and Buchanon's affidavit, the Magistrate learned that Buchanon was investigating a New York-based group that manufactured and distributed counterfeit credit cards, and that an informant had stated that King was the "mastermind" behind the credit card ring and had brought Donald Sanders ("Sanders") from California to New York to supervise production of counterfeit cards. According to Buchanon's affidavit, on September 4, 1982 Sanders had been arrested in

Chicago and a search incident to arrest produced documents reflecting the purchase of the equipment and collection of information necessary to produce counterfeit credit cards, including orders for equipment ordered out of 160 West 46th Street, New York City, and Sanders' telephone book in which King's name and home address appeared. King had rented rooms at the stated address and in doing so, described himself as a "silkscreen artist."

On September 7, 1982, following Sanders' arrest, Postal Inspectors had conducted two searches, one at 47 Hall Street, Brooklyn, New York, and the other at 160 West 46th Street in Manhattan. At 47 Hall Street, Inspectors had found large pieces of vinyl plastic on which the Mastercard logo was imprinted. An employee had told the Inspectors that less than an hour prior to their arrival, two men had removed from the premises equipment that was used by one of them to produce counterfeit credit cards. At 160 West 46th Street, Inspectors indicated that the room rented by King had been "cleaned out," but found some art work used to make counterfeit American Express cards. No attack has been made on these searches.

In addition the Magistrate was advised that the informant had learned from another criminal associate of King's that King had and was hiding all of the equipment used to produce the credit cards. On October 5, 1982, Postal Inspectors discovered that King had a legitimate credit card and that on September 8, 1982, the day after the two searches described above, the King credit card was used to rent a 10 foot by 15 foot storage space at the Space Station and an employee at the Space Station verified that the rental contract was still in effect and had just been extended until November 8, 1982, all of which was conveyed to the Magistrate.

Based on the Buchanon affidavit and the *Sanders* complaint the Magistrate found probable cause to believe that counterfeit credit card equipment would be found at the Space Station. King asserts that there is no connection between the equipment and the Space Station, and that the affidavit fails to establish probable cause that the equipment was located in the warehouse.

Our Court of Appeals recently set forth the general principles governing the review of a finding of probable cause in this Circuit:

A search warrant is properly issued upon a determination of probable cause by a neutral and detached magistrate, *see Steagald v. United States,* 451 U.S. 204, 212–13, 101 S.Ct. 1642, 1647–48, 68 L.Ed.2d 38 (1981), from information set forth in sworn affidavits which set forth the "grounds for issuing the warrant." Fed.R.Crim.P. 41(c)(1). Hearsay information contained in an affidavit can suffice to establish probable cause. *Jones v. United States,* 362 U.S. 257, 269–70, 80 S.Ct. 725, 735–36, 4 L.Ed.2d 697 (1960), provided there is a "substantial basis for crediting the hearsay," *United States v. Harris,* 403 U.S. 573, 581, 91 S.Ct. 2075, 2080, 29 L.Ed.2d 723 (1971) (plurality opinion). While a reviewing court should "not serve merely as a rubber stamp for the police," it is firmly established that substantial deference should be accorded judicial determinations of probable cause. *Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964). "[I]n a close case any doubts should be resolved in favor of upholding the warrant." *United States v. Jackstadt,* 617 F.2d 12, 14 (2d Cir.) (per curiam), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980).

*United States v. Zucco,* 694 F.2d 44, at 46 (2d Cir.1982). It is against the backdrop of substantial deference that this court must review the Magistrate's finding.

Buchanon's affidavit sets forth "a sufficiently suspicious set of overlapping facts," *United States v. Manafzadeh,* 592 F.2d 81, 90 (2d Cir.1979), to support the Magistrate's issuance of the warrant. The sequence of events and the information provided by the informant give rise to a reasonable inference that equipment was probably being moved and stored in the Space Station.

King concedes that the nexus between the objects to be seized and the place to be searched need not rest on "direct observation, ... but on the type of the crime, the nature of the missing items, the extent of the subject's opportunity for concealment, and the normal inferences as to where a criminal would be likely to hide stolen property." *United States v. Lucarz,* 430 F.2d 1051, 1055 (9th Cir.1970). *Accord Anthony v. United States,* 667 F.2d 870 (10th Cir. 1981), *cert. denied,* 457 U.S. 1133, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1982); *United States v. Pheaster,* 544 F.2d 353, 373 (9th Cir.1976), *cert. denied,* 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977). As the Government points out, this principle has been applied in many cases to support the search of a defendant's residence for property which one might reasonably expect to find there, but which no one had direct knowledge was there, *see e.g., United States v. Melvin,* 596 F.2d 492, 497–98 (1st Cir.), *cert. denied,* 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979); *United States v. Maestas,* 546 F.2d 1177, 1179–80 (5th Cir.1977); *United States v. Samson,* 533 F.2d 721, 723 (1st Cir.), *cert. denied,* 429 U.S. 845, 97 S.Ct. 126, 50 L.Ed.2d 116 (1976); *Iverson v. State of North Dakota,* 480 F.2d 414, 417–18 (8th Cir.), *cert. denied,* 414 U.S. 1044, 94 S.Ct. 549, 38 L.Ed.2d 335; *United States v. McCann,* 465 F.2d 147, 159 (5th Cir.1972), *cert. denied,* 412 U.S. 927, 93 S.Ct. 2747, 37 L.Ed.2d 154 (1973), and to uphold the search of a defendant's automobile where it was the "logical place to conceal such highly incriminatory objects," even though there was no firsthand knowledge to support that logical conclusion. *United States v. Fortes,* 619 F.2d 108, 114–15 (1st Cir.1980). Similarly, a search of a defendant's safety box is proper where it was "reasonable to infer" that it was a repository for his goods, even in the absence of direct knowledge to that effect. *United States v. Gomez,* 633 F.2d 999, 1008–09 (2d Cir.1980), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981). Thus it is not necessary that any person saw the equipment in the Space Station or saw it being placed there.

Moreover, contrary to King's assertions, the information provided by the informant meets the two-pronged test set forth in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1969). The fourth paragraph of Buchanon's affidavit reads as follows:

4. *CS 2.* I have spoken with Special Agent Gordon Strand, Federal Bureau of Investigation, who has also been involved in the investigation of this case. Agent Strand has received the following information from a confidential source (hereinafter "CS 2"). CS 2 has been involved in the distribution of counterfeit credit cards and has dealt directly with the persons in the group that I have been investigating. CS 2 has provided reliable information in the recent past which has been the basis for five successful search warrants. CS 2 told Agent Strand that George King is the "mastermind" behind the credit card ring; that King was responsible for producing the credit cards; that he had brought a person named Donald Sanders from California to New York to do the art work; and that King was distributing the cards to organized crime figures here in New York. CS 2 said that he has learned from another criminal associate of King's that King now has possession and is hiding all of the equipment used to produce the credit cards.

King concedes that the reliability prong of *Aguilar* is met since the informant had provided reliable information in the recent past which has been the basis for five successful search warrants. As for the underlying circumstances prong, although the affidavit does not specifically state that the credit card ring in which the informant was involved was the one of which King was allegedly the "mastermind," this appears to be a reasonable construction of the language in the affidavit. In fact, the Government has indicated in its memorandum that the language means the informant was "an active participant in the credit card scheme." Moreover, the informant had learned from another "criminal associate" of King's that King had and was hiding the equipment. Even if the informant had

been involved in a different credit card ring and although the information proffered by King's "criminal associate" may amount to double hearsay, the informant was indeed familiar with the counterfeit credit card business and knew people involved in King's counterfeit activities. Finally, the informant's information was corroborated by independent investigation: Sanders had been arrested and incriminatory documents found on his person; King had been found to be the lessee of premises from which equipment had been ordered (and presumably to which equipment had been shipped) and at which American Express card art work had been found.

Without giving any weight to a link between the Hall Street location and King, the affidavit is still sufficient. It sets forth a sequence of events that links Sanders to King, and King to equipment that was in some respect connected to the premises at 160 West 46th Street. On or about September 7, Sanders was arrested, a search of 160 West 46th Street turned up art work to make counterfeit credit cards in a room that had been "cleaned out," and on the next day, King rented a 10 by 15 foot storage space, a logical hiding place for equipment. The fact that there were other places the goods "might be stored" is not dispositive. *United States v. Rahn*, 511 F.2d 290, 293–94 (10th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975). These events and the information from the informant described circumstances from which the Magistrate could reasonably infer that the equipment was located in the premises to be searched. Mindful that the Magistrate's finding is entitled to substantial deference, *United States v. Jackstadt*, 617 F.2d 12, 13 (2d Cir.) (per curium), *cert. denied*, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980), I conclude that there existed a substantial basis in the affidavit from which the Magistrate could find probable cause.

For these and the reasons indicated above the motions of Elsis and King are denied.

This case will be tried on December 27, 1982.

IT IS SO ORDERED.