UNITED STATES of America

v.

Nelson Bunker HUNT and W. Herbert Hunt.

Cr. No. 5–485.

United States District Court,
N. D. Texas,
Lubbock Division.

Nov. 14, 1973.

Frank D. McCown, U. S. Atty., Fort Worth, Tex., by Richard H. Stephens, Asst. U. S. Atty., Dallas, Tex., for plaintiff.

Philip K. Hirschkop, Alan J. Cilman, Alexandria, Va., Travis D. Shelton, Lubbock, Tex., Ralph B. Shank, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

WOODWARD, District Judge.

The defendants are charged with willfully, knowingly and unlawfully intercepting and endeavoring to intercept wire communications of persons calling to and from telephones located at the residences of six different persons in Dallas, Texas, in violation of Title 18, United States Code, section 2511(1)(a) and section 2. A separate count charges such a violation for each of the six telephones.

The defendants have duly filed a motion to suppress certain evidence, alleging that it was acquired in a manner which was violative of their rights under the fourth amendment. Specifically, they seek to prevent the admission by the government of any evidence obtained in or as a result of the search of a red Ford Mustang in Richardson, Texas on or about January 16, 1970. More specifically, the defendants complain of the seizure of a certain tape recorder from that automobile and the subsequent playing of the recording tape located thereon by the Richardson police and the Federal Bureau of Investigation. The contents of this tape alerted the investigating authorities to the violations alleged in the indictment.

Patrick W. McCann III and Jon Joseph Kelly have previously been charged in a four-count indictment flowing from four of the wire interceptions involved in the present case. McCann and Kelly were convicted in another court and sentenced to 3 years in prison. Their conviction was affirmed by the United States Court of Appeals for the Fifth Circuit in United States v. McCann, 465 F.2d 147 (5th Cir. 1972). The trial court denied the defendant's motion to suppress in that case and the denial was specifically reviewed and affirmed by the Court of Appeals in its opinion. The defendants Hunt are, however, certainly entitled to a separate and *de novo* consideration of their motion to suppress by this court.

Defendants have been afforded two evidentiary hearings in this case during which much testimony and several documents were introduced by both sides. After considering that evidence, along with the briefs and oral arguments of counsel, the court files this Memorandum Opinion which shall constitute the Findings of Fact and Conclusions of Law pertinent to defendants' motion to suppress.

## FACTUAL BACKGROUND

For several days prior to the arrest of Kelly and the search of the Mustang on January 16, 1970, the Richardson Police Department had received several complaints from residents of that city that certain automobiles would be left unattended on residential streets for periods of a day or so and that then another

automobile would be substituted for the first and similarly left unattended until it too was replaced. An investigation by the Richardson police revealed that all of these automobiles had been rented by certain persons who gave various hotels as their local addresses but listed fictitious Houston home and business addresses. The police also determined that these persons changed hotels more than once during the period in which the car switching occurred. A factor which was considered to be significant by the police was the presence of an identically arranged pile of newspapers several inches high and on a level with the transmission hump on the right front floorboard of all of the involved vehicles.

According to the testimony, the investigating officers discussed these facts periodically (there is conflicting testimony as to whether these discussions were daily or weekly) at meetings held between shift changes. Included among various interpretations of these facts that were discussed were the possibilities that these cars were being used as a "narcotics drop," that they were being used in conjunction with a scheme to burglarize residences in the area and that they were somehow being used by private detectives involved in a domestic investigation. These facts had been communicated to George M. Taylor, the arresting officer, through these various meetings and discussions prior to the time of the arrest.

On January 16, 1970, officer Taylor was assigned to conduct a "stake-out" and surveillance of the Mustang, which was one of the cars that had been left unattended by the suspects on this particular day. He relieved officer Ray Pennington, who had been watching the parked Mustang during the day, and parked his own automobile in the driveway of a nearby residence, out of the view of anyone in or standing next to the Mustang. At the September 17, 1973 hearing on the motion to suppress, Taylor testified that, on the basis of the facts determined by or communicated to him, he "would go out there and do it

and set up surveillance" and also that he was "going to stop the car and, if somebody came to pick it up, talk to them." (Transcript, p. 30) He further testified that, at that time, he had no knowledge that a crime was being committed by anyone connected with the automobile-switching.

About 5:00 P.M. on this same day Taylor observed a man approach the Mustang, stop near it, stoop to pull up his socks, look at all the tires and, finally, get in it and drive away. Taylor then followed the Mustang but he admitted that to this point the driver appeared to be engaged in purely legal activity. However, Taylor then switched on the red lights on his car so that the man in the Mustang would pull over for questioning. Taylor testified that the driver of the other car ran a stop sign before he pulled over to the curb and stopped. It should be noted that Jon Joseph Kelly, who in fact was the driver of the Mustang at this time, testified that he did not run a stop sign. Taylor further stated that Kelly did not attempt to escape or in any other way avoid the officer's signal to stop. After Taylor stopped his car within a few feet of the Mustang, both drivers stepped out of their cars and met about midway between the vehicles. Taylor stated that he immediately informed Kelly that he was being charged with running a stop sign and with violation of "the suspicious persons ordinance." Interestingly, both of these charges were later dropped. Upon the officer's request, Kelly produced a valid Texas driver's license.

From this point there are significant contradictions between the testimony of the two men. Taylor testified that he asked Kelly "would it be okay if I go ahead and look in the car" that Kelly replied, "okay, go ahead." (Transcript, pp. 48, 49). Kelly, however, testified that Taylor did not seek permission to search the car but rather stated that, "I'm going to look in your car, I want to see what's in it, I want to see what's under the newspapers." Kelly flatly de-

nied that he granted permission for the search.

In any event, officer Taylor walked to the driver's side of the car, leaned across the front seat and unlocked the passenger door. At that point Taylor noticed a green briefcase protruding from beneath the pile of newspapers on the floorboard. Taylor testified that he then asked Kelly what was in the briefcase, to which the reply was, "I have no idea." Taylor also stated that Kelly told him that a friend had dropped him off at the Mustang but that he did not know the friend's name nor could he further identify him. He then lifted away the newspapers, opened the attaché-type briefcase and discovered a tape recorder located therein.

Taylor testified that Kelly was close behind him during this search but Kelly contended that he had remained at his original position between the automobiles. Taylor testified that he asked Kelly certain questions, among which was whether he was a private investigator working on a divorce case. According to Taylor's version of this episode, Kelly's reply was, "I think I need to call my attorneys," and at this point Taylor decided to arrest Kelly. Kelly, though, has denied requesting an attorney until he reached the police station, sometime later. Taylor then instructed Kelly to get inside the police car. By this time other officers had arrived to assist Taylor, and one of them drove the Mustang, which still contained the briefcase and recorder, to the police station. The car was parked in the station house lot and locked, and the keys were delivered to officer Taylor. Taylor reported to his supervisor, officer Burleson, and then retrieved the briefcase from the locked Mustang, without further seeking permission from Kelly or any other person. Taylor's testimony reveals that at this time he still did not have specific knowledge that a crime had been committed.

At no time did any of the investigating officers apply for or obtain a warrant to search or seize the Mustang or any of its contents nor, more pertinently, did they seek a warrant to search the seized tape by playing and listening to it. The evidence establishes, however, that a Magistrate or Justice of the Peace was located within five or six miles of the police station and, therefore, that the search warrant procedure was readily available to the police.

Despite the proximity of a Magistrate, officers Taylor and Burleson did indeed listen to the tape on this same day, and the record indicates that they were able to identify one of the persons whose voice was recorded on the tape. The officers then notified a security officer at the offices of Southwestern Bell Telephone Company, who in turn notified Special Agent Holloman of the F.B.I. After arriving at the police station about 7:00 P.M., Holloman listened to the tape and then accompanied Burleson to the Richardson home of a Mr. Rothermel, whose wife identified her voice as being one of those on the seized recording. Employees of Southwestern Bell then located a transmitting device on the telephone pole behind the Rothermel home which was used to transmit signals from their telephone line to the recorder in the nearby parked car.

Subsequently Mr. McCann was arrested and Kelly's motel room was searched pursuant to a warrant. Defendants recognize that this court is bound by the validity of the search affidavit as far as the face thereof is concerned, but they do contend that the probable cause for the issuance of the warrant was based solely upon facts which were obtained through the allegedly invalid playing of the seized tape and misleading facts, and, therefore, that any evidence seized from the hotel room should be suppressed under the doctrine announced in Silverthorne v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), popularly referred to as the "fruits of the poisoned tree" doctrine.

McCann also testified that the defendants in this case had reimbursed Kelly and McCann, or the detective agency for

which they worked, for all of the expenses of their investigation. These expenses included the rental fees for the cars involved, rental of the various motel rooms, and cost of the several tape recorders which were used and a quantity of recording tape. Edited tape recordings containing pertinent recorded conversations were to be given to the Hunts. McCann further testified that it was his understanding that the recorders, the tapes and all the other equipment used in the surveillance for which he was reimbursed belonged to the Hunts. Other personnel of the detective agency, Clyde Wilson & Associates, corroborated McCann's testimony as to payment for and ownership of the equipment.

The findings of this court as to the facts surrounding the arrest and detention of Kelly, the search of the Mustang and the briefcase therein, are substantially identical to the findings made by the Court of Appeals in its opinion in United States v. McCann, *supra.* However, the defendants herein assert that additional evidence and legal grounds have been presented to this court that are sufficient to compel the granting of their motion to suppress, notwithstanding the denial of a similar motion in the Kelly-McCann case. The pertinent additional evidence appears to be as follows:

A. Arresting officer Taylor's testimony at the September 17, 1973 hearing that he would not have arrested Kelly if Kelly had answered that he was working on a divorce case;

B. Taylor's statement that he definitely decided to arrest Kelly only after Kelly asserted his sixth amendment rights by stating that he wanted to see his lawyer;

C. Taylor's testimony that when he left the Richardson police station on the afternoon of January 16, 1970 to stakeout the Mustang, he intended to stop and interrogate anyone who attempted to drive away in the car, even though he had no knowledge that a crime was being committed at that time;

D. Kelly's previously unoffered testimony that he did not give anyone permission to search the car and that he did not tell officer Taylor that he wished to see his lawyer.

The defendants' position is that the additional evidence shows that the arrest of Kelly was a sham since it was not based upon probable cause. Defendants also contend that the ensuing search of the automobile and playing of the tape were invalid under the fourth amendment.

■ Although it may be that had this additional evidence been originally presented to the District Court during the hearing on the motion to suppress by McCann and Kelly, that that court and the Court of Appeals would have granted the motion, this court feels, especially in view of the contradictory evidence between Taylor and Kelly, that the decision of the United States Court of Appeals for the Fifth Circuit in *McCann, supra,* should control insofar as it is applicable to the points raised in that case. However, as will later appear, this court feels that there are certain legal matters and facts which were neither urged nor considered in that case, but which have a material bearing on the matter now before the court. In any event, this court concludes that officer Taylor had reasonable grounds to stop the Mustang and make a general investigative inquiry of its driver and that after the car was stopped there was either consent or probable cause to search the car. The search of the briefcase when it was located on the floorboard of the Mustang at the point of arrest was also authorized for the opinion of the Fifth Circuit held that

> "Detective Taylor would have been derelict in his duty had he not opened the briefcase."

However, the defendants in this case are entitled to have this court consider their motion to suppress based upon the testimony that has been presented to this court in the two evidentiary hearings. Along with the additional evidence delin-

eated earlier the defendants raise the following evidence and legal arguments which were neither presented to nor considered by either the trial court or the appellate court in the *McCann* case:

Officer Burleson and officer Taylor, after the car had been locked and stored at the police station, obtained the briefcase, opened it, and played the tape found on the recorder. Subsequently, agent Holloman of the Federal Bureau of Investigation played the tape. None of these officers attempted to obtain a search warrant authorizing them to search the tape recording. Defendants take the position that the playing of the tape without a search warrant violates the defendants' fourth amendment rights and that the evidence secured by the prosecuting authorities by reason of the information they obtained from this tape should be suppressed. This court finds that this point was not raised in the *McCann* case and that the opinion does not indicate that the Court of Appeals in any way considered the question of whether or not the playing of the tapes without a warrant was a violation of the defendants' fourth amendment rights.

This court is of the opinion that the position of the defendants is sound and that the motion to suppress should be granted. The court's reasoning is set out below.

## STANDING

■ A threshold issue in this case is whether or not the defendants have "standing" to challenge the validity of the search, since they were not present at the scene. The Supreme Court of the United States in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), in construing the right of a person to assert fourth amendment rights by a motion to suppress filed under Rule 41(e), Federal Rules of Criminal Procedure, stated:

"In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed to someone else."

"To establish 'standing', courts of appeals have generally required that the movant claim either to have owned or possessed the seized property or to have had a substantial possessory interest in the premises searched."

A case squarely in point on this issue of standing is United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951). That case involved a seizure of narcotics belonging to the defendant from an apartment which was not his residence, in which he had no proprietary or possessory interest and in which he was not present during the search. Justice Clark, writing for the Supreme Court, held that defendant's property interest in the seized contraband was sufficient to support his standing to move for suppression of the evidence. The United States District Court for the Western District of Pennsylvania in 1957 held in United States v. Lester, 21 F.R.D. 376, affirmed 282 F.2d 750 (3 Cir.) that "one has the requisite standing as a person aggrieved if he claims *ownership* of the seized property, although the premises searched belonged to another." (emphasis added) The Sixth Circuit in 1965 in United States v. Thomas, 342 F.2d 132 stated that if an accused neither owned, possessed nor lived at the searched premises, was not present at the time of the search, and did not show any possessory interest in the objects seized, then he would have no standing to challenge the search. Mere ownership of a searched automobile gives standing, even when the owner is not present at the search. Cash v. Williams, 455 F.2d 1227 (6th Cir. 1972). In denying standing to an accused in United States v. Banks, 465 F.2d 1235 (5th Cir. 1972), the Court held that the defendant could not prevail under Rule 41(e) since he did not have sufficient proprietary

interest in the premises searched or possessory interest in the property seized.

■ The uncontradicted evidence produced at the evidentiary hearings in this court can lead only to the conclusion that the Hunts owned, and thus had a proprietary interest in, the tape recorder and tapes since they ultimately paid for both the tape recorder and the tapes. This proprietary interest is sufficient to give the Hunts standing to challenge the search and the evidence gathered thereby.

The government contends that United States v. Johnson, 456 F.2d 295 (5th Cir. 1972) is a "white horse" case and that it conclusively supports their position. The reasoning in *Johnson*, though, is inapplicable to the case *sub judice*. The Court of Appeals there held that the appellant had no standing to challenge the search, but there was no evidence in that case that he had a proprietary interest in either the seized contraband or the searched van. Furthermore, *Johnson* is distinguishable from Jones v. United States, *supra,* because the former case did not involve a crime of possession and the appellant was not present during the search.

The court having determined that the defendants have standing to challenge the search in question, the next question to consider is the validity of the search.

## VALIDITY OF THE SEARCH

■ In Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1947), the Court stated:

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers."

It is well established that searches conducted outside of the judicial process, without prior approval of a judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject to only a few specifically established and well-delineated exceptions. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); United States v. Garay, 477 F.2d 1306 (5th Cir. 1973).

In determining whether or not the search of the tape recorder (i. e., the playing of the tape found thereon) comes within one of the exceptions to the general requirement of a search warrant, the court has kept in mind that the Court of Appeals has already approved the procedures of the police in this case up to and including the opening of the briefcase. Therefore, this court must now examine the circumstances surrounding this latter search in light of the exceptions to the general rule.

The Sixth Circuit has delineated very explicitly these "exigent circumstances" exceptions to the general requirements of a search warrant in United States v. Nelson, 459 F.2d 884 (6th Cir. 1972), as follows:

### (1) *Search of an Automobile*

■ The search involved in this case cannot fall within this exception. The traditional basis for this exception is the inherent mobility of an automobile and the consequent danger that the vehicle and its contents may be moved before a search warrant can be obtained. *See* Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) and Chambers v. Maroney, 399 U.S. 42, 90

S.Ct. 1975, 26 L.Ed.2d 419 (1970). This rationale is inapplicable here, however, because the automobile and its contents were validly seized at the scene of the arrest and transported to the police station. The recorder and the tape were then carried into the station house, where the tape was played. Thus the search was conducted not at the point where the automobile was seized but later in the police station and, had the police delayed the search of the tape in order to obtain a search warrant, there would have been no danger that the tape could have been carried away in the automobile.

### (2) Incident to Lawful Arrest

■ The search of the tape recorder and the playing of the tapes was not made incident to a lawful arrest. *See* Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The search was not made at the scene of the arrest and in fact was made some two hours later after Kelly had been arrested and locked in his cell in the city jail. The Fifth Circuit in United States v. Davis, 423 F.2d 974 (1970), held under somewhat similar circumstances that there was no justification for search without a warrant. In that case a search was conducted three and a half hours after the arrest of the accused, and while searching for the pistol the police went to his home and without a warrant searched the home. The Fifth Circuit held that, to be incident to an arrest, the search must be justified by the need to seize weapons or the need to prevent the destruction of evidence, but that these justifications are lacking where the search is remote in time or place from the point of arrest.

It would be unreasonable to hold that, although the tape recorder was seen and discovered at the place of arrest, that the playing of the tape thereon was also incident to arrest when there was absolutely no danger of its destruction, it was in the possession of the police and the driver of the car was in jail, and

there is no indication that the search was in any way connected with a seizure of weapons or an attempt to prevent the escape of Kelly or anyone else.

In Brett v. United States, 412 F.2d 401 (5th Cir. 1961), the appellate court held that a search of an accused's clothing, which had been placed in custody of the jailer in the prisoners' property room, made three days after arrest was invalid. The court held that this search was not incident to arrest and was not even close to or contemporaneous with the time of arrest. In that case the Fifth Circuit held that none of the circumstances justifying application of the "search incident" exception were present because there was no danger that the clothing would be removed nor that they concealed weapons which could be used by the defendant in an escape attempt and there was ample time to obtain a search warrant. The same statements and findings can be applied to the case under consideration by this court. The court went on to hold: "Focus in the Fourth Amendment cases today is on privacy rather than on property rights." *Id.* at 406. The Fifth Circuit in a subsequent case, United States v. James, 432 F.2d 303 (1970), found that a search made after the time of arrest and at a different place from the arrest itself was necessary for effective law enforcement and that such effective law enforcement would have been frustrated if there was any delay as there were conspirators possibly still at large. Of course *James* can be distinguished from *Hunt*, because at the time of the search in the latter case, the police could have had no indication that there were co-conspirators loose who might escape.

In Chimel v. California, *supra*, the Court, in holding the warrantless search of a room invalid, quoted Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948), which stated:

"A search or seizure without a warrant as an incident to lawful arrest has always been considered to be a

strictly limited right. It grows out of the inherent necessities of the situation at the time of arrest. But there must be something more in the way of necessity than merely a lawful arrest." *Id.* at 759, of 395 U.S., at 2038 of 89 S. Ct. The requisite necessity is clearly lacking in the present case.

### (3) *Plain View Doctrine*

■ The plain view doctrine is not applicable here. *See* Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L. Ed.2d 1067 (1968). Although the briefcase was seen by the officer while engaged in the lawful search of the car, this court does not hold that the seizure or opening of the briefcase was unlawful, but that it was the playing of the tape itself, (without authority of a properly issued search warrant) that this court holds to be unwarranted.

The government has argued that the contents of the tape were in plain view, just as would be the writing on a piece of paper. That argument is illogical, however, for there are obvious intrinsic differences between the two. This court holds that the playing of the tape was a separate search in itself and that the recorded conversations were not in the "plain view" of the investigating officers. The government further argues that the playing of the tapes was an analysis of lawfully obtained evidence to determine whether it was an instrumentality of crime rather than a search for evidence. The prosecution compares the playing of the tape to dusting for fingerprints, analyzing suspected narcotics, and testing blood found on weapons. This attempted analogy is not persuasive to the court. The government's semantics are not sufficient to overcome this court's opinion that the playing of the tape was a search of the tape recorder for the purpose of finding incriminating evidence.

### (4) *Consent*

■ Of course, if anyone having authority to do so had consented to the playing of the tape, then the search would have been valid even without a warrant. Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). The only person that could have given consent in this case was Kelly. Even if Taylor's version of what happened at the scene of arrest is accepted, that is that consent to look into the car was obtained, this cannot be construed as consent to play the tape. Consent is clearly not present under the facts of this case.

### (5) *Immediate Threat of Life*

■ Again, at the time this tape was played no one accused or under suspicion in this case, was in close proximity to either the tape recorder or the tape. Only Kelly was present at the police station and he was incarcerated during the search. To state that it was necessary to play the recorder and the tape thereon in order to prevent an immediate threat to life would be absurd. *See* Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

### (6) *Officers in Hot Pursuit of a Fleeing Felon*

■ The only pursuit involved in this case was the initial pursuit by Taylor of Kelly when he drove away in the Mustang. Even had the search taken place immediately after that pursuit, the exception would not apply because Taylor had no knowledge that Kelly had committed a crime. Regardless, the search with which this court is concerned took place two hours later at the police station and was in no way connected with the initial pursuit. *See* Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

### *Exigencies of the Situation*

Although the above-discussed categories have been listed as exceptions to the search warrant requirement of the Fourth Amendment, the reported cases also hold generally that "exigent circumstances" must be present before a warrantless search may be conducted. *See,*

e. g., Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). While the six categories are in fact examples of "exigent circumstances," this court is of the opinion that a more general analysis of the exigencies in the case at bar is required.

 In 1948 the Supreme Court of the United States held in McDonald v. United States, 335 U.S. 451, at page 456, 69 S.Ct. 191, at page 193, 93 L.Ed. 153, that:

"We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation make that course imperative."

It is well settled that the burden is upon the United States of America to show an exception to the rule that a search without a warrant is *per se* unreasonable. To do so exigent circumstances must be shown to have existed.

In United States v. Garay et al., 477 F.2d 1306 (5th Cir. 1973) at page 1308 the court held:

"While the exigencies of the situation may well have justified the warrantless detention of appellants, they cannot validate the search of the suitcases made at the time when appellants were under restraint, if not under formal arrest. At that point, appellants were incapable of concealing or destroying the suitcases or their contents. Nor was there any significant probability that the suitcases would escape search by being moved to Chicago or Detroit aboard the airplane. . . ."

In that case the appellants had been arrested at an airport and their two suitcases had been loaded aboard their plane. The luggage checks were in the possession of the police and even there the search of these suitcases without a warrant was declared invalid. The court went on to hold:

"In short, the officers could and should have held the bags until they obtained a warrant authorizing an examination of the contents."

*Id.* at 1308. Further, this court is of the opinion that the motion to suppress in this case should be granted under the holding of the Fifth Circuit in United States v. Soriano et al., 482 F.2d 469 (5th Cir. 1973).

There the officers had observed the defendants place three suitcases in the trunk of a taxicab. The court held that the officers' previous knowledge justified the stopping of the taxicab and the arrest of the accused. The officers also took the suitcases from the trunk and on the scene opened and searched them. It was held that the agents had probable cause to believe that the occupants of the taxicab were carrying narcotics and they were justified in opening the trunk and removing the suitcases and could seize the suitcases. However, the crucial question there was whether the officers could open and search the validly-seized suitcases without first obtaining a warrant. The court, after holding that the suitcases were effects under the Fourth Amendment, held that the search was invalid.

The government argued that the exigent circumstances required an immediate search without a warrant and that in any event no warrant was needed to search personal property after that property had been validly seized. The court expressly rejected both contentions and, with respect to the right to search personal property validly seized without a warrant, held:

"In this case the search significantly increased the interference with privacy. As a factual matter it differed markedly from the initial seizure after which the contents of the suitcases remained undisclosed to the world."

"Thus the search was unlawful because it intruded on an interest protected by the Fourth Amendment and because a warrant could have been readily obtained without prejudicing the need for effective law enforcement."

*Id.* at 476. Certainly the evidence sought to be suppressed in the *Hunt* case falls within the purview of this holding. The search made after the seizure, that is the playing of the tape, significantly increased the interference with privacy and it differed markedly from the initial seizure which was and is here held to be proper. After the initial seizure, the contents of the tape remained undisclosed and a warrant could have been readily obtained from the proper authority without impairing the ability of the police to enforce the law in this case.

The police had probable cause to stop and arrest Kelly and to seize the tape recorder and tape. "These [were] legitimate intrusions by way of seizure, but such legitimate intrusions by way of seizure do not topple like dominoes all remaining privacy interests in the personal effect." Page 12, United States v. Soriano, *supra.* The Fifth Circuit in *Soriano* also quoted the Supreme Court in Chimel v. California, *supra:*

> "There is no reason why, simply because some interference with an individual's privacy and freedom of movement has lawfully taken place, further intrusions should automatically be allowed despite the absence of a warrant that the Fourth Amendment woud otherwise require."

It is the holding and conclusion of this court that though the detention of Kelly, his arrest, and the seizure of the briefcase and the tape recorder were warranted by the circumstances and were all legitimate intrusions upon fourth amendment rights, the further intrusion of playing the seized tape was not justified.

Accordingly it is Ordered that the defendants' motion to suppress the admission into evidence of the tape and the contents thereof be Granted. It is further Ordered that this motion to suppress will be granted as to all evidence gathered as a result of the playing of the tape under the doctrine of Silverthorne v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920) and Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1962).

An order will be issued accordingly.