**UNITED STATES of America,**
**Plaintiff-Appellant,**

**v.**

**Nelson Bunker HUNT and W. Herbert Hunt, Defendants-Appellees.**

**No. 74-1142.**

United States Court of Appeals,
Fifth Circuit.

Dec. 23, 1974.

Frank McCown, U. S. Atty., Fort Worth, Tex., Richard Stephens, Asst. U. S. Atty., Dallas, Tex., for plaintiff-appellant.

Philip J. Hirschkop, Alan J. Cilman, Alexandria, Va., Ralph B. Shank, Dallas, Tex., Travis D. Shelton, Lubbock, Tex., for defendants-appellees.

Before RIVES, GEWIN and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

This case presents a troublesome question of standing to contest the legality of a police search and seizure of certain instruments of electronic surveillance allegedly employed by brothers Nelson Bunker Hunt and W. Herbert Hunt against a group of their own relatives and some employees of their father, H. L. Hunt. After indictment on charges of wilfully, knowingly and unlawfully intercepting and endeavoring to intercept wire communications of certain persons in violation of 18 U.S.C. §§ 2511(1)(a) and (2),[1] defendants filed a motion to suppress the disputed evidence pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure. After a hearing, the district court concluded that defendants had standing to contest the search and seizure and that a part of the search was in fact illegal, and accordingly granted the motion to suppress. Since we find no warrant in the Fourth Amendment for surrogate privacy, we believe that the district court erred in finding a sufficient nexus between the search and defendants' Fourth Amendment rights to confer standing to contest the police action. We must reverse.

Sometime in late October or early November, 1969, the defendant Hunt brothers allegedly contacted one Everett, the president of a Houston, Texas, private investigation agency, regarding the possibility of employing his agency to perform electronic surveillance of certain residences in Dallas, Texas. The Hunts purportedly represented to Everett that they had been the victims of extensive embezzlement and desired to obtain information concerning suspected employees. Everett contacted McCann, an electronics expert, and asked him to travel to Dallas to make an estimate of the job requirements and costs. When McCann returned to Houston and reported his findings, Everett contacted the Hunts and the deal was consummated.

The electronic surveillance operation required the use of tape recorders and tapes, which McCann purchased at retail stores, and certain other paraphernalia, including telephone transmitters, most of which McCann manufactured himself. McCann engaged a man named Watson to install some of the electronic equipment on strategically-located telephone poles and in various rental automobiles which were parked on a rotated basis outside the target houses. McCann and Kelly, an employee of Everett's detective

1. 18 U.S.C. § 2511 provides, in pertinent part:
 (1) Except as otherwise specifically provided in this chapter any person who—
 (a) wilfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication . . . shall be fined not more than $10,000 or imprisoned not more than five years, or both. [Section two lists various exceptions to the general rule of section one.]

agency, worked in Dallas throughout late December, 1969, and early January, 1970, rotating the automobiles which McCann and Kelly would rent, use and then return to the various rental agencies. The pair also changed the tapes when necessary, "condensed" the original tapes—edited out extraneous telephone conversations—and gave the master tapes to defendants.[2] McCann returned to Houston on or about January 9, and at some point thereafter, Everett presented defendants with a bill for all expenses incurred by McCann, Kelly and Watson, including the cost of the equipment, auto rental fees and food and lodging expenses, and for the cost of the services of the three gentlemen. When defendants paid their bill, Everett sent them an itemized receipt. Everett later paid McCann, Kelly and Watson for their services and reimbursed them for their expenses.

The spectacle of strange automobiles appearing and remaining unattended for some hours before being removed and replaced by other strange unattended autos did not pass unnoticed in the quiet Dallas suburb of Richardson, Texas, where one of the "suspected" Hunt employees lived. An alarmed neighbor alerted the Richardson police to the unusual activity on January 9 and the police began to surveill the surveillers. On January 16, 1970, after the police investigation of the matter had turned up some very suspicious circumstances relating to the recent activities of McCann and Kelly, but before the police were able to decide whether the pair were involved in the narcotics trade, a burglary ring, or the investigation of an unpleasant divorce, a Richardson police officer observed Kelly enter a suspected auto and drive away. The officer followed and indicated to Kelly that he should pull over; Kelly promptly did so.

After a brief conversation, the officer walked over to Kelly's vehicle, noticed a pile of newspapers on the floor, lifted the papers and discovered a tape record-er. He then arrested Kelly and the two men drove to a police station, where police officers proceeded to play one of the tapes without bothering to obtain a search warrant beforehand. The playing of the tape prompted an investigation which led to the indictment and conviction of McCann and Kelly on federal wiretap charges and to the indictment of defendants here.

The facts of the original search of Kelly's car were recounted at length by this Court in United States v. McCann, 5 Cir. 1972, 465 F.2d 147, cert. denied, 412 U.S. 927, 93 S.Ct. 2747, 37 L.Ed.2d 154, and need not be repeated here; suffice it to say that we found that the officer who searched the automobile had both Kelly's consent to search and probable cause to do so. The defendants here claim that our decision in *McCann* suffered from a lack of certain evidence which they have now supplied—evidence which tends to indicate that Kelly did not consent to the search of the auto and that the officer had no probable cause to search the vehicle in any case. The district court below found otherwise, 366 F.Supp. 172, and concluded that the stop and search of Kelly's auto were proper. The court also found, however, that the playing of the tape constituted a second search without a warrant, and that this search violated defendants' Fourth Amendment rights. Applying the fruit of the poisonous tree doctrine, Wong Sun v. United States, 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441; Silverthorne v. United States, 1920, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, the district court ordered that "all evidence gathered as a result of the playing of the tape" be suppressed. 366 F.Supp. at 183. Since defendants have no standing to contest either search, we pretermit further discussion of the legitimacy of those searches.

I

The requirement that a litigant have "standing" to contest a partic-

**2.** The original tapes were erased and reused after their contents, as edited, had been transferred to the master tapes.

ular lawsuit is based upon the metaphysical notion that, in our adversary legal system, a court must be very certain that the parties before it have "a personal stake in the outcome of the controversy," Baker v. Carr, 1962, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678, so that each side will represent its particular interests to the best of its abilities and thus afford the court a fully-informed choice between two clearly-stated alternatives. *See* Flast v. Cohen, 1968, 392 U.S. 83, 88 S.Ct. 1942, 20 L. Ed.2d 947. In practice, of course, things do not always work out that way; many individuals and groups who are genuinely interested in a given controversy may be unable to satisfy the traditional requirements for standing. For this reason, among others, the law of standing has been liberalized over the past decade in many areas to comport with the reality of litigant interest. *See, e. g.,* Data Processing Service v. Camp, 1970, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184; Barlow v. Collins, 1970, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192; Flast v. Cohen, *supra*; Griswold v. Connecticut, 1965, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510. At the same time, the policies supporting a standing requirement have retained sufficient vitality to ensure that litigants must show more than a *de minimis* interest before they will be admitted into the courtroom. *See, e. g.,* Sierra Club v. Morton, 1972, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636.

In some respects, the necessity of standing to object to unconstitutional searches and seizures is more anomalous than most standing requirements. The major rationale for the exclusionary rule, whereby evidence obtained in an unconstitutional manner may not be used in a criminal prosecution, is that only such a drastic means will effectively deter law enforcement officials from violating the Fourth Amendment rights

of citizens. *See* Mapp v. Ohio, 1961, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081; Weeks v. United States, 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652.[3] Given this premise, one might suppose that any citizen should be able to apprise the courts of unconstitutional searches and seizures; otherwise, policemen might in some cases break the law with impunity. However that may be, there is no precedent for not demanding standing to question a search. The courts have settled upon a requirement of some "standing" to contest Fourth Amendment violations, reasoning that the added deterrent effect of a "no standing" or minimal standing rule in search and seizure cases would be of slight social value in comparison with the large social cost imposed by criminals who would take advantage of such a rule. Although as an abstract proposition of law, the standing requirement might not have logical primordialty, it does possess interpretative validity and solidity; it is not the case "that anything which deters illegal searches is thereby commanded by the Fourth Amendment." Alderman v. United States, 1969, 394 U.S. 165, 174, 89 S.Ct. 961, 967, 22 L.Ed.2d 176, 187.

## II

In order to determine the precise extent of the standing requirement as it applies in this case, we must first analyze just what demonstrable interests are requisite to standing; we must determine what individual rights and liberties the Fourth Amendment protects. It is often asserted that the Fourth Amendment's function is to preserve and protect "the right of privacy" for all citizens. As is frequently the case with broad generalizations, this characterization says at once too much and too little. The Fourth Amendment provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches

---

3. For a lengthy critique of the deterrent efficacy of the exclusionary rule, *see* Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U.Chi.L.Rev. 665 (1970); *see also* the dissent of Chief Justice Burger in Bivens v. Six Named Unknown Agents, 1971, 403 U.S. 388, 411, 91 S.Ct. 1999, 29 L.Ed.2d 619.

and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Amendment was enacted while the memory of British tyranny was fresh in the minds of the Founding Fathers. The British military had latterly become accustomed to taking whom or what they wanted at any time they wanted, and for any reason or no reason at all. This course of official conduct did not find favor with a generation of Americans which accounted the rights of personal liberty and private property as the most valuable and basic of human expectations. The rights of liberty (including the right of privacy) and of property were not as clearly differentiated in the minds of eighteenth-century Anglo-Americans as they are in modern estimation. Blackstone, for example, was of the opinion that property is the right to exclude,[4] and American jurisprudence preserved this conceptual unity of privacy and property for Fourth Amendment purposes for a very long time.

In Boyd v. United States, 1886, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746, the United States Supreme Court held that a federal statute compelling production of certain private papers was an unconstitutional "invasion of [the defendant's] indefeasible right of personal security, personal liberty and private property" which struck at "the very essence of constitutional liberty and security". 116 U.S. at 630, 6 S.Ct. at 532, 29 L.Ed. at 751. Boyd was an affirmation of the principle that some things cannot be searched or seized regardless of whether a proper procedure is followed, that a search of private papers is per se an "unreasonable search." This doctrine of

absolute immunity of certain types of personal property from search or seizure was not undone until 1914, when the Supreme Court, in Weeks v. United States, supra, adopted the exclusionary rule and substituted a concern for proper procedure for the former concern for the nature of the thing searched or seized. Even after Weeks, the philosophical legacy of Blackstone and Boyd was so firmly implanted in the collective consciousness of American courts that instrumentalities of a crime could not be seized until 1921, Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647, and "mere evidence" of a crime could not be seized until 1967. Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782.

■ The procedural revolution begun in Weeks has taught us that the Amendment builds no impermeable barrier between an individual's person, house, office, automobile or strongbox and the outside world. If law enforcement officials follow the proper procedures to ensure that they can demonstrate sufficient interest in a particular person, place or thing, then they may seize and examine the object of their investigation.

Perhaps the fact that policemen can now, under the proper conditions, search and seize anyone or anything has compelled the courts to make a careful study of which search procedures are repugnant to those widely-held concepts of personal security and dignity which have been subsumed into the "right of privacy." It is this study which led to Justice Stewart's comment in Katz v. United States, 1967, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582, that "the Fourth Amendment protects people, not places." This part of the Fourth Amendment inquiry has required a determination, not of what privacy is

---

4. "There is nothing which so generally strikes the imagination, and engages the affections of mankind, as the right of property; or that sole and despotic dominion which one man exercises over the external things of the world, in total exclusion of the right of any other individual in the universe." Blackstone, Commentaries, Book II, Chapter I. See also the famous opinion of Lord Camden in Entick v. Carrington, 1765, 19 How.St. Trials.

—for everyone assumes agreement on that point—[5] but of whether a given individual in a given situation could have a reasonable expectation of privacy in the particular place or thing searched. So it was that in Jones v. United States, 1960, 362 U.S. 257, 80 S.Ct. 725, 4 L. Ed.2d 697, the Supreme Court determined that an invitee had a cognizable privacy interest in preserving the apartment in which he was a guest from unlawful intrusion by the police. In Katz v. United States, *supra,* the Court ruled that an individual has a significant privacy interest in insulating his own telephone conversations from electronic monitoring, whether he makes his calls from his own home or from a public telephone booth.

If modern Supreme Court interpretations of the Fourth Amendment are dominated by the concept of the right of privacy, the Court has not foresworn an examination of property rights in order to determine the presence or absence of privacy interests. Although the Court announced in Warden v. Hayden, *supra,* that "[t]he premise that property interests control the right of the Government to search and seize has been discredited," 387 U.S. at 304, 87 S.Ct. at 1648, 18 L.Ed.2d at 790, that same Court determined two years later in Alderman v. United States, *supra,* that an individual's property interest in his own home was so great as to allow him to object to electronic surveillance of conversations emanating from his house, even though he himself was not a party to those conversations.[6]

 In summary, although the right of privacy has been the major theme of modern Fourth Amendment jurispru-

dence, the property rights rationale cannot be ignored altogether.[7] Perhaps it would not be too much to say that the continuing concern with property rights is prompted by the realization that an individual often has a very reasonable expectation of privacy in his private property, and that it is this expectation which the Fourth Amendment protects. There may be a cognizable Fourth Amendment interest in the absence of a traditional property right, but it is almost certainly true that property rights cannot support a Fourth Amendment claim in the absence of a reasonable expectation of privacy in the property involved. Such an analysis would go far in explaining the Court's tendency in the last fifteen years to discard traditional property concepts in search and seizure cases where, as in *Jones, Hayden* and *Katz,* those concepts seem no longer to reflect modern expectations of privacy in the place or thing in question, and the willingness of the Court to rely on those same property concepts where, as in *Alderman,* the common law continues to reflect modern ideas of personal dignity and security.

### III

We have discussed the logical and constitutional bases of the standing requirement in Fourth Amendment cases; we now address ourselves to an examination of the case law on the subject. Since this action comes to us in the posture of an appeal of an order suppressing evidence pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure, we begin with an exposition of that Rule, which provides in pertinent part that:

A person aggrieved by an unlawful search and seizure may move the dis-

---

5. Justice Stewart defines the *"general* right of privacy" as an individual's "right to be let alone by other people." Katz v. United States, *supra,* 389 U.S. at 350–351, 88 S.Ct. at 511, 19 L.Ed.2d at 581. *See* Fried, "Privacy," 1968, 77 Yale L.J. 475.

6. Justice Harlan objected strenuously to this reliance on the property underpinnings of the Fourth Amendment, and would have preferred to rely on the "substantive principles

developed in *Katz."* 394 U.S. at 191, 89 S. Ct. at 976, 22 L.Ed.2d at 197.

7. As Justice Black noted in dissent in Griswold v. Connecticut, *supra,* "[t]he average man would very likely not have his feelings soothed any more by having his property seized openly than by having it seized privately and by stealth. . . ." 381 U.S. at 509, 85 S.Ct. at 1695, 14 L.Ed.2d at 530.

trict court . . . for the return of the property and to suppress for the use as evidence anything so obtained on the ground that (1) the property was illegally seized without a warrant . . .

The Supreme Court held in Jones v. United States, *supra,* that in order to qualify as a "person aggrieved by an unlawful search and seizure" for purposes of Rule 41(e), "one must have been a victim of a search and seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else." 362 U.S. at 261, 80 S.Ct. at 731, 4 L.Ed.2d at 702.

 Since *Jones,* the development of the law of standing in Fourth Amendment cases has turned on whether the defendant in question was a "victim" of the search, the "one against whom the search or seizure was directed." Generally, a defendant satisfies the standing requirement if he has an adequate possessory interest in the place or object searched to give rise to a reasonable expectation of privacy. Ownership usually constitutes such an interest, United States v. Banks, 5 Cir. 1972, 465 F.2d 1235, cert. denied, 409 U.S. 1062, 93 S.Ct. 568, 34 L.Ed.2d 514, but a reasonable expectation of privacy in the enjoyment of a place or object may attach where there is little or no proprietary interest. In *Jones,* for example, the de-

fendant was present as a common law "invitee" in the apartment of a friend, when police performed an illegal search of the apartment. The Court awarded the defendant standing even though his common law possessory interest did not amount to much, because he was legitimately on the premises, and thus had a privacy interest in the apartment.[8] The *Jones* Court merely enunciated the unremarkable proposition that an individual may have a reasonable expectation of privacy in a place other than his own home. In this tradition, in Mancusi v. DeForte, 1968, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154, the Supreme Court found that an individual could reasonably expect freedom from governmental intrusion into his working area, even though he shared parts of an office with others. Conversely, a defendant cannot claim standing if he neither has a cognizable property interest in the place or thing searched, nor was present at the time of the search. United States v. McConnell, 5 Cir. 1974, 500 F.2d 347; United States v. Palazzo, 5 Cir. 1974, 488 F.2d 942; United States v. Sullivan, 5 Cir. 1973, 488 F.2d 138.

 In *Jones,* the Court also created the doctrine of "automatic standing," whereby, in a case where possession of the seized evidence is itself an essential element of the offense with which the defendant is charged, the Government is precluded from denying that the defendant has the requisite possessory interest to challenge admission of the evidence.[9]

---

8. Many standing cases since *Jones* have concerned themselves with the phrase "legitimately on the premises." For example, an individual who has paid for his hotel room has a reasonable expectation of privacy in that room, Garza-Fuentes v. United States, 5 Cir. 1968, 400 F.2d 219, cert. denied, 1969, 394 U.S. 963, 89 S.Ct. 1311, 22 L.Ed.2d 563; one who hides from the police in a hotel room for which he has not paid, however, has no standing to contest a search of the room. United States v. Gregg, 6 Cir. 1968, 403 F.2d 222, aff'd, 1969, 394 U.S. 489, 89 S.Ct. 1134, 22 L.Ed.2d 442. Although this distinction might seem to turn on a comparison of the property interests involved, the property interests are really only indicators

of the various expectations of privacy peculiar to each situation. *See* Baker v. United States, 1968, 131 U.S.App.D.C. 7, 401 F.2d 958.

9. The Court adopted the *Jones* rule in order to eradicate the unseemly practice whereby prosecutors would deny at the suppression hearing that a defendant charged with a possessory offense actually owned the disputed evidence, thereby forcing the defendant to claim ownership; the prosecutor would then confront the hapless defendant at trial with his claim of ownership made at the suppression hearing. *Jones* enabled a defendant in such a case to contest a search without admitting ownership. In Simmons

One of the most significant aspects of the law of standing in search and seizure cases, and one that clearly reflects the intensely personal nature of Fourth Amendment rights, is the rule that interpersonal relationships cannot make a "victim" of one who is not otherwise "one against whom the search or seizure is directed." Generally speaking, the Fourth Amendment protects the "I" but not the "thou." So it is that one spouse may not complain if the other is searched. United States v. Altizer, 5 Cir. 1973, 477 F.2d 846; *but see* Alderman v. United States, *supra,* 394 U.S. at 193–194, 89 S.Ct. at 977, 22 L.Ed.2d at 198 (Harlan, J., concurring in part and dissenting in part). Nor may one business partner assert an interest in the search of another partner solely on the basis of the partnership relation. United States v. Frick, 5 Cir. 1973, 490 F.2d 666. Finally, Alderman v. United States, *supra,* dictates that co-defendants and co-conspirators may not assert the Fourth Amendment rights of their alleged partners in crime solely on the basis of their interpersonal association, because Fourth Amendment rights are personal ones. See United States v. Sullivan, *supra;* Granza v. United States, 5 Cir. 1967, 377 F.2d 746. Since co-defendants and co-conspirators can often make out some semblance of a property right in the sorts of things that might be searched and seized from their cohorts, *Alderman* demonstrates once again the primacy of privacy in the modern Fourth Amendment schema.

The Supreme Court has recently restated the law of standing in search and seizure cases, in Brown v. United States, 1973, 411 U.S. 223, 93 S.Ct. 1565, 36 L. Ed.2d 208. In *Brown,* two defendants were convicted of conspiring with a third individual to transport stolen goods in interstate commerce. Evidence obtained from an allegedly unlawful search of the co-conspirator's premises was admitted in the separate trial of the other two defendants. The Court, relying on *Alderman,* concluded that the disputed evidence was rightfully admitted against defendants, who alleged a possessory interest in neither the premises searched nor the merchandise seized:

> [T]here is no standing to contest a search and seizure where, as here, the defendants: (a) were not on the premises at the time of the contested search and seizure; (b) had no proprietary or possessory interest in the premises; and (c) were not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure . . . ." 411 U.S. at 229, 93 S.Ct. at 1569, 36 L. Ed.2d at 214.

Although the rule of standing applied to the specific facts of *Brown* might appear at first glance to be somewhat more restrictive than previous formulations with respect to the search and seizure of objects, the Court's later remark that defendants "failed to allege any *legitimate* interest of any kind in the premises searched or the *merchandise seized,*" 411 U.S. at 229, 93 S.Ct. at 1569, 36 L.Ed.2d at 214 (emphasis added), clearly indicates that *Brown* conforms to the general rule of standing, and that the Court has not neglected the language in the Fourth Amendment concerning "papers, and effects." *See* United States v. Groner, 5 Cir. 1974, 494 F.2d 499, cert. denied, —— U.S. ——, 95 S.Ct. 331, 42 L.Ed.2d 285. *Brown* concisely states the rule of standing in Fourth Amendment cases: defendants must demonstrate a "legitimate

v. United States, 1968, 390 U.S. 377, 88 S. Ct. 967, 19 L.Ed.2d 1247, however, the Court held that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt. Although *Simmons* appears to have removed much of

the opportunity for the sort of abuse at which the *Jones* rule is aimed, and although the Court has recently cast some doubts on the continued vitality of *Jones,* Brown v. United States, 1973, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208, the rule is still the law.

interest" of some kind in the premises searched or the objects seized. That interest may or may not be founded on some common law proprietary interest; the decisive factor in determining whether a search or seizure is "reasonable" for Fourth Amendment purposes is whether the complaining party's reasonable expectations of privacy have been unreasonably disturbed.

## IV

Defendants here were not present at the search in question, nor are they charged with a possessory offense, so that they cannot claim either of those bases for standing. Rather defendants contend that they may contest the search on three other grounds: 1) their possessory interest in the seized tape recorders and tapes; 2) their agency relationship with McCann and Kelly; and 3) the prohibitions of the Texas search and seizure statute, coupled with the federal policy giving full effectuation to state exclusionary rules. We will examine these contentions in turn.

■ Defendants claim that their proprietary interest in the tape recorders and tapes is sufficient to bring them within the well-established rule conferring standing upon individuals having a possessory interest in the place or object searched or seized. Because their bill from Everett included the cost of every item seized, defendants claim title to every tape recorder and tape used in the operation. They point to the testimony of McCann and Everett at the suppression hearing below, to the effect that the equipment "belonged to the Hunts," as irrefutable evidence of their possessory interest in the electronic surveillance equipment. Finally, defendants rely on our recent decision in United States v. Banks, *supra,* for the proposition that legal title to an object always conveys standing to complain of a search thereof.

The first major difficulty with defendants' argument is that their claim of ownership is a very tenuous one. The record demonstrates that Everett and McCann occupied a contractual position in relation to the Hunts that is very close to the common law notion of an "independent contractor."[10] Defendants contacted Everett about doing a job for them; Everett consulted McCann, who determined how the job could best be completed and how much it would cost; the defendants agreed to the price proposed by Everett, and had no more to do with the operation until they paid the bill. Everett had already retained Kelly as an employee of his detective agency; McCann hired Watson as a specialist. McCann and Kelly purchased every item of equipment with their own financial resources, paid for every rental car, every motel room, every meal with their funds, and were reimbursed by Everett upon completion of the project. Defendants never saw any of the equipment, either during or after the operation, except for certain master tapes, none of which were taken in the disputed search and seizure.

■ Whether an individual is a servant or an independent contractor depends upon whether the employer has a right to control the details of the work, Strangi v. United States, 5 Cir. 1954, 211 F.2d 305; Newspapers, Inc. v. Love, Tex.1964, 380 S.W.2d 582, and the record does not show that the defendants at any time had any desire to interfere or could have interfered with the operation as planned by McCann and Everett and enacted by McCann, Kelly and Watson. The nature of the contractual relationship between Everett and McCann on the one hand and defendants on the other, makes defendants' claim to ownership of the tape recorders and tapes a diaphanous one at best.

■ Whatever title defendants may possess in the disputed evidence, we can-

---

10. For an exposition of the conflicting and confusing development of independent contractor law, *see* Comment, "Risk Adminis- tration in the Marketplace: A Reappraisal of the Independent Contractor Rule," 1973, 40 U.Chi.L.Rev. 661.

not help but reflect that this discussion of master and servant law and legal title has taken us very far from the substance of Fourth Amendment rights. As we have indicated above, the constitutional right of protection against unreasonable searches and seizures attaches only when an individual's reasonable expectation of privacy is shattered by illegal Government intrusion. Whatever minimal possessory interest defendants may have in the seized equipment, we have been unable to discern the slightest privacy interest that defendants could reasonably assert in objects which they have never seen and of whose particular existence they were unaware until after the disputed search and seizure. If *Jones, Katz, Alderman* and *Brown* teach us anything, they indicate that common law notions about proprietary relations offer no *per se* rules in search and seizure cases; a naked assertion of possessory interest may be indicative but cannot be dispositive of the existence of a cognizable privacy interest in the place or thing searched. In the absence of a demonstrable expectation of privacy in the tape recorders and tapes, defendants can have no standing to protest the search and seizure. They may not vicariously assert the Fourth Amendment rights of McCann and Kelly.

There is nothing in our *Banks* case which confers standing upon defendants. In that case, Adams, Banks, Moody and George operated a counterfeiting ring. Banks purchased the printing press and certain other equipment; Moody furnished a garage to house the press; Adams, Banks and George operated the press; George distributed the counterfeit currency; Adams, Banks and George took equal shares of the proceeds. George was apprehended in the act of distributing some of his artwork, and gave information that led to the issuance of a warrant to search Moody's garage, which search led to the discovery of the press, the arrest of Adams and Banks, and the claim of the latter two individuals that the warrant was unconstitutionally defective. We held that Adams had no standing to object to the search, because he was not present at the time of the search and had no possessory interest either in Moody's garage or in the printing press. On the other hand, we found that Banks certainly had standing to object to the seizure of a press which he had purchased directly with his own funds (for which he had not been reimbursed by his partners in crime) and which he had operated in the course of the common criminal scheme. There was in *Banks* no dispute as to the full measure of Banks' title to the press, nor any controversy as to his direct and enduring relationship to the machine. In short, there was in *Banks* that affirmative showing of reasonable expectation of privacy in the seized equipment that is so lacking here.

A case which is much more analogous to the present controversy than *Banks* is United States v. Johnson, 5 Cir. 1972, 456 F.2d 295. In *Johnson,* defendant had paid one Langner $450 to travel to Mexico, purchase marijuana from a prearranged contact and return the marijuana to him in the United States. Langner was stopped on his return to this country, the marijuana discovered and seized, and Johnson arrested. We found that Johnson had no standing to challenge the search for want of a sufficient privacy interest in the marijuana; he was not the individual at whom the search was aimed. Johnson's possessory interest in the seized marijuana was arguably greater than that of defendants here in the disputed electronic equipment because Johnson had arranged all the details of the operation and expected to receive the marijuana upon Langner's safe return; none of these things can be said about defendants in this case.

Defendants also argue that they must be awarded standing of the *Jones* variety in order to prevent the Government from contending on the one hand that defendants are responsible as principals for the violations by their agents McCann and Kelly of the federal wiretapping statute, while avowing on the other hand that this same principal-agent rela-

tionship does not suffice to confer standing upon defendants to contest a search of their agent Kelly's auto and electronic equipment. There is no merit in this argument.

 This is not a case, as *Jones* was, where the Government's contradictory allegations create a cruel dilemma whereby a defendant accused of a possessory offense must either incriminate himself at the suppression hearing or waive his opportunity to have illegally-obtained evidence suppressed. Defendants here are placed in no such dilemma by unfair prosecutorial tactics. There is in fact nothing contradictory about the United States' argument in this case; a principal-agent relationship sufficient to imply culpability may certainly fall short of conferring standing for Fourth Amendment purposes. Defendants' contention flies directly in the face of *Alderman,* where the Supreme Court held that co-defendants and co-conspirators do not possess standing to object to searches of their compatriots solely on the basis of their criminal relation.

Although there may well be cases in which a principal may object to a search of his agent's papers or effects, this is not one of them. Fifteen years of Supreme Court decisions stand squarely in the way of defendants' attempt to create a rule of *per se* standing for parties in a principal-agent relationship. This claim of privacy by agency is just the sort of vicarious assertion of Fourth Amendment rights that *Alderman* and *Brown* forbid. If we were to adopt the position urged by defendants, any criminally-inclined individual could earn a double dividend by hiring private investigators to complete his schemes: not only could the principal disassociate himself from any physical unpleasantness or risk involved in the criminal activity and at the same time cover his own tracks, but he could claim a privacy interest in any instrumentalities of the crime, no matter whether he had the slightest idea of the existence of such instrumentalities before the unpleasant epiphany of arrest.

Finally, defendants claim standing by virtue of Texas law and the Supreme Court's decision in Elkins v. United States, 1960, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669, to forbid federal courts to utilize evidence which would be excluded in state courts by operation of a state exclusionary rule. Article 38.23 of the Vernon's Ann.Texas Code of Criminal Procedure provides that:

> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case. . . .

As defendants correctly point out, Article 38.23 is a broad state exclusionary rule. *See* Mapp v. Ohio, *supra.* Defendants argue that the disputed evidence here was illegally obtained, so that it would be inadmissible in Texas courts, and that the rule of *Elkins* forbids federal courts to admit evidence that state courts would thus exclude:

> [W]hen a federal court sitting in an exclusionary state admits evidence lawlessly seized by state agents, it not only frustrates state policy, but frustrates that policy in a particularly inappropriate and ironic way. For by admitting the unlawfully seized evidence the federal court serves to defeat the state's effort to assure obedience to the Federal Constitution. . . . 364 U.S. at 221, 80 S.Ct. at 1446, 4 L.Ed.2d at 1680.

Defendants contend that Texas is so desirous of deterring its law enforcement officers from making illegal searches and seizures that Article 38.23 minimizes, if not eschews, standing requirements in state cases. From this premise, defendants conclude that *Elkins* prevents federal courts from requiring standing in Texas search and seizure cases where, as here, Texas officers are involved.

 Defendants cite us no Texas cases in support of their novel proposi-

tion, and with good reason: Texas law requires standing in search and seizure matters, and this state requirement differs in no material respect from the federal law of standing as outlined above. *Stiggers v. State*, Tex.Cr.App.1974, 506 S.W.2d 609; *Clemons v. State*, Tex.Cr. App.1973, 501 S.W.2d 92; *Booth v. State*, Tex.Cr.App.1973, 499 S.W.2d 129. Texas law confers no standing upon defendants here.

We have carefully examined the record and considered the defendants' various arguments. Neither the one nor the others convince us that defendants enjoyed a reasonable expectation of privacy in the disputed evidence. Under the rule of *Johnson*, and of *Jones, Katz, Alderman* and *Brown*, the Hunts cannot be said to be "aggrieved" by the searches of Kelly's automobile and the tapes; neither search was in any way directed at the defendants. To hold otherwise would stand these precedents on their heads. Fourth Amendment guarantees partake of a privateness which is not subject to barter or bailment. There is no standing room for persons positioned as defendants under the Fourth Amendment as elucidated in the exegesis of our judicial forebears.

Reversed and remanded.